AUGAT, INC., & another[1] *vs.* AEGIS, INC., & another.[2]

Bristol. October 1, 1990. - January 16, 1991.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Trade Secret. Corporation,* Officers and agents. *Contract,* Employment. *Unfair Competition. Fiduciary.*

Where corporate plaintiffs had not preserved the confidentiality of certain sales figures, they could not prevail on their claim against a business competitor alleging that the competitor had joined with a trusted employee of the plaintiffs in obtaining the figures, in breach of the employee's duty of loyalty, and had disclosed them to the competitor's potential investors. [169-171]

A corporation and its subsidiary were entitled to recover damages from a competitor who participated, with the subsidiary's general manager, in secretly soliciting key employees of the subsidiary and inducing them to leave their employment and to join the general manager in the competing enterprise. [171-176]

Statements by certain employees, who left their positions in order to work for their employer's business competitor, provided no basis for a misrepresentation claim by the employer against the competitor. [176-177]

The state of mind of the operators of a business enterprise in engaging in competition did not alone provide any basis for liability to a competitor. [177]

A corporate employer was entitled to an order requiring the return of a certain notebook, containing confidential information, which a former employee had taken with him on leaving his position. [177-178]

CIVIL ACTION commenced in the Superior Court Department on April 26, 1985.

The liability portion of the case was heard by *John D. Sheehan,* J.

---

[1] Isotronics, Inc.

[2] Jeremy D. Scherer.

Leave to prosecute an interlocutory appeal was allowed in the Appeals Court by *Rudolph Kass*, J. The Supreme Judicial Court transferred the case on its own initiative.

*Edmund C. Case* (*Scott A. Birnbaum* with him) for the defendants.

*Blair L. Perry* (*Robert C. Kirsch* with him) for the plaintiffs.

WILKINS, J. The plaintiff Isotronics, Inc. (Isotronics), a subsidiary of the plaintiff Augat, Inc. (Augat), manufactures high reliability metal microcircuit packages used to house electronic circuits. The individual defendant (Scherer) was one of three stockholders who sold Isotronics to Augat in 1975. He continued to work for Isotronics until 1980, served next as an Augat vice president, and then acted as a consultant to Augat until April, 1983. In May, 1984, one month after his agreement not to compete with Isotronics expired, Scherer formed the defendant Aegis, Inc., intending to manufacture high reliability metal and ceramic microcircuit packages. Scherer then communicated with Jay Greenspan, who was vice president and general manager of Isotronics, offering him employment and an equity interest in Aegis. Greenspan, an able and energetic manager, held a position of trust and confidence in Isotronics and was primarily responsible for Isotronics's success in becoming the dominant force in the metal packaging industry. Greenspan was not happy at Isotronics. In 1983, he had explored the possibility of forming his own company, but had been unable to obtain financing. At that time, Greenspan had discussed his plan with four Isotronics employees who held important senior managerial positions. Greenspan told Scherer that these senior managers had been interested in Greenspan's 1983 plan. In May or June, 1984, Greenspan and Scherer approached these four men, and over the next several months had meetings with them, separately and collectively, and on occasion also with prospective investors in Aegis. Three of these four men subsequently left Isotronics and went directly to work for Aegis. One major ground for the plaintiffs' claims against the defendants is that, in secretly seeking to obtain the services of

key Isotronics managers, they knowingly joined in Greenspan's breach of his duty to Isotronics. That breach, the plaintiffs assert, in time led to a disruption of Isotronics when all those managers left Isotronics within a period of approximately two months.

In the summer of 1984, Scherer devoted his efforts to obtaining financing for Aegis. Greenspan and three of the managers who had been on Greenspan's prospective list in 1983 were committed to work for Aegis, if Aegis could be funded. The existence of the prospective management team was the most important factor in the view of the venture capitalists. Scherer prepared a detailed business plan, describing Aegis's purposes; its potential competitors; the size and condition of the packaging market, including the fact that Isotronics controlled about two-thirds of that market; and, without naming the others, the experience and background of Aegis's anticipated management team. The other major ground for the plaintiffs' claims in this case is that, in breach of his duty to maintain the confidentiality of Isotronics's gross sales figures, Greenspan disclosed precise figures to Scherer, who was then able to include in his business plan information about the current size of the metal packaging market, information that Scherer would not otherwise have had and without which, it is claimed, venture capitalists would not have invested in Aegis.

Scherer sent his business plan to potential investors late in July, 1984. Greenspan delivered a letter of resignation on August 1, 1984, not stating any specific date for his departure. He made no mention then, or at any other time, of the possible departure of those key managers with whom he and Scherer had been talking or of other Isotronics personnel with whom Greenspan had been talking about joining Aegis. The prospective management team of Aegis met early in September and agreed on their relative shares of ownership of Aegis stock. Greenspan left Isotronics on September 27. On October 9, Aegis received a commitment letter for an investment of $4,300,000. The transaction was concluded on

November 6. Aegis then entered the metal packaging business, not producing its first packages until May, 1985.

Augat and Isotronics brought this action in April, 1985, advancing various claims against the defendants. After extensive discovery and other pretrial activity and the bifurcation for trial of the liability and damages portions of the case, the matter was tried in June and July, 1988, before a judge without a jury, during twenty-four trial days. In August, 1989, the judge filed his findings of fact and rulings of law. After a Justice of the Appeals Court, in October, 1989, allowed the defendants to take an interlocutory appeal, the judge filed amended and supplemental findings of fact and rulings of law. We transferred the defendants' interlocutory appeal here on our own motion.

The trial judge ruled in the plaintiffs' favor on only a portion of their theories of liability. He found for the defendants on the claim that various employees who went to Aegis had entered into noncompetition agreements with Isotronics. He found no appropriation of Isotronics's trade secrets, no solicitation by Aegis of customers while Greenspan worked for Isotronics, and no misappropriation of customer lists.

The judge concluded, however, that the defendants were liable for Greenspan's breach of his duty of loyalty to Isotronics in disclosing confidential information to Scherer about Isotronics's level of annual sales. We disagree with this ruling because information concerning Isotronics's general level of sales was not confidential and no specific information concerning that level of sales was required by prospective venture capitalists. The judge also ruled that Greenspan violated his duty of loyalty when, while still an Isotronics employee, he secretly solicited key managerial employees to join Aegis once it was funded. We uphold this ruling. He also ruled that other former Isotronics employees had violated their duty to Isotronics, a point we reject. Additionally, the judge found liability because of misrepresentations made to Isotronics and Augat and an intent of Greenspan and Scherer to cripple Isotronics. We reject these theories as independent bases of liability.

1. We reject the plaintiffs' theory of liability based on the fact that, as the judge found, Greenspan, while an employee of Isotronics, disclosed confidential information to Scherer concerning the precise level of Isotronics's sales of metal packaging. The argument is that, armed with Isotronics's sales figures, Scherer was able to provide information to venture capitalists without which they would not have invested $4,300,000 in Aegis. Scherer did not disclose precise sales figures to potential investors, but he did state in a business plan sent to potential investors, late in July, 1984, that Isotronics's annual sales were between $30,000,000 and $32,000,000.

Potential investors would be interested, of course, in the approximate size of the market in which they would be investing their funds. We accept the conclusion, inherent in the judge's findings, that the people who invested in Aegis would not have done so without that information.

Isotronics held about two-thirds of the metal packaging market in 1984, a fact that was known to people knowledgeable about the industry, in part because Isotronics did not keep that fact confidential. This information suggests that the approximate volume of sales in the entire industry was known by people who knew the industry.

Although general business information and routine data of a particular company normally are not protectible as confidential (*New England Overall Co., Inc.* v. *Woltmann,* 343 Mass. 69, 77 [1961]), the gross sales of a corporation might properly be protectible as confidential in particular circumstances, although that information would not be a "trade secret" of the traditional kind. See *Jet Spray Cooler, Inc.* v. *Crampton,* 361 Mass. 835, 839-840 (1972); *New England Overall Co., Inc.* v. *Woltmann, supra* at 75. We shall assume that, in particular circumstances, the amount of Isotronics's gross annual sales of metal packages could be protectible, confidential information, and, if so, an employee would have a duty not to disclose that information.

In determining confidentiality, several factors are relevant, including "the extent to which the information is known

outside of the business"; "the extent of measures taken by the employer to guard the secrecy of the information"; and "the ease or difficulty with which the information could be properly acquired . . . by others." *Jet Spray Cooler, Inc.* v. *Crampton, supra* at 840. By these tests, the plaintiffs' claim that the dollar volume of Isotronics's sales was entitled to protection as confidential information fails.

Isotronics did not consistently and diligently treat the level of its annual sales as a confidential corporate fact. Its acknowledgement and the acknowledgement of people interested in the industry that Isotronics had about two-thirds of the sales in the industry suggest strongly that the total annual sales of the industry were known in approximation by Isotronics and others. If the approximate volume of sales by Isotronics's competitors was generally known, as had to be the case for Isotronics to determine its market share, Isotronics's disclosure of its market share in effect disclosed its approximate annual sales volume. Moreover, the chairman of the board of directors of the plaintiff Augat met regularly with securities analysts who covered Augat and in effect provided them with estimates of the annual sales of Isotronics. It was in Augat's interests, as two of its officers testified, that investment analysts have such information because a departure of corporate performance from the expectations of investors could have an adverse effect on the value of Augat's stock. In guiding securities analysts toward the approximate level of Isotronics's annual sales, the plaintiffs obviously did not "guard the secrecy of the information" and equally obviously made the information "known outside of the business" (i.e. outside of Augat and Isotronics). *Jet Spray Cooler, Inc.* v. *Crampton, supra.*

In addition to disclosures by the plaintiffs that destroyed any confidentiality of Isotronics's annual sales figures, there was evidence that several analysts were able to arrive at approximations of Isotronics's annual sales volume from a study of generally available information. The judge made no findings on this evidence, perhaps because he concluded that the plaintiffs' unwillingness to disclose actual figures, as op-

posed to facilitating estimates, preserved the confidentiality of Isotronics's sales information. Because we conclude that the plaintiffs' own conduct belied the confidentiality of Isotronics's annual sales figures, we need not consider whether this unchallenged evidence that sales information was readily and independently discoverable provides an independent ground for denying confidentiality to Isotronics's sales figures.

The important point here is that, to make an investment decision, the people who invested funds in Aegis did not require or receive precise sales figures. They obtained only approximations, in circumstances not involving the disclosure of legally protected confidential information. Moreover, as a matter of law, the plaintiffs have failed to show that, but for Greenspan's disclosure of precise sales figures to Scherer, the financing of Aegis would not have been possible.

2. We agree with the plaintiffs that the defendants are liable for Greenspan's breach of his duty of loyalty to Isotronics in not protecting Isotronics's interests against the loss of key employees to Aegis. Greenspan, as a vice president and general manager of Isotronics from 1981 to September 27, 1984, ran all aspects of Isotronics under the general supervision of the president of Augat, who was also the president of Isotronics. Greenspan was responsible for staffing and for hiring necessary replacements for any employees who might leave Isotronics. He regarded his duties to include maintaining at least one "backup" employee for each managerial position.

While Greenspan was still general manager of Isotronics he and Scherer solicited several important Isotronics employees to join Aegis if and when it were to be financed. Among those solicited, who later left Isotronics and went directly to work at Aegis, were: the vice president for marketing and sales, who left Isotronics on November 11, 1984; the new product design manager, Isotronics's most experienced engineer in the technology of making metal packages, who left on November 30, 1984; the manufacturing manager for Isotronics, who left on January 7, 1985; and Isotronics's engineering manager, who left on January 4, 1985.

Scherer and Aegis make no serious argument that they are not liable if they participated with Greenspan (or any other Isotronics employee) in a violation of his duty of loyalty to Isotronics. See *Barden Cream & Milk Co. v. Mooney*, 305 Mass. 545, 547 (1940) (liability for joining in employees' wrongful conduct); *BBF, Inc. v. Germanium Power Devices Corp.*, 13 Mass. App. Ct. 166, 173 (1982) (same). We reject the defendants' suggestion that, because an Isotronics employee could not be liable to Isotronics under G. L. c. 93A (see *Manning v. Zuckerman*, 388 Mass. 8, 12-15 [1983]), they also may not be liable under G. L. c. 93A. See *Peggy Lawton Kitchens, Inc. v. Hogan*, 18 Mass. App. Ct. 937, 940 (1984).

It is important to define the limited basis for liability we recognize in this case. An at-will employee may properly plan to go into competition with his employer and may take active steps to do so while still employed. See *Meehan v. Shaughnessy*, 404 Mass. 419, 435 (1989); *Chelsea Indus., Inc. v. Gaffney*, 389 Mass. 1, 10 (1983). Such an employee has no general duty to disclose his plans to his employer, and generally he may secretly join other employees in the endeavor without violating any duty to his employer. *Id.* at 12 n.20. The general policy considerations are that at-will employees should be allowed to change employers freely and competition should be encouraged. See *Maryland Metals, Inc. v. Metzner*, 282 Md. 31, 47-48 (1978). If an employer wishes to restrict the post-employment competitive activities of a key employee, it may seek that goal through a non-competition agreement. See *All Stainless, Inc. v. Colby*, 364 Mass. 773, 778 (1974); *Spring Steels, Inc. v. Molloy*, 400 Pa. 354, 362-364 (1960). The plaintiffs did not do so in this case.

There are, however, certain limitations on the conduct of an employee who plans to compete with his employer. He may not appropriate his employer's trade secrets. See *Eastern Marble Products Corp. v. Roman Marble, Inc.*, 372 Mass. 835, 838-842 (1977). He may not solicit his employer's customers while still working for his employer (see

*Chelsea Indus., Inc.* v. *Gaffney*, *supra* at 11-12 [as to executive employees]), and he may not carry away certain information, such as lists of customers (*New England Overall Co., Inc.* v. *Woltmann*, 343 Mass. 69, 77 [1961]). Of course, such a person may not act for his future interests at the expense of his employer by using the employer's funds or employees for personal gain or by a course of conduct designed to hurt the employer.

The special circumstance of this case, distinguishing it from the typical case of improper employee conduct leading to competition with a former employer, is that there is but one significant breach of duty. It is important but substantially isolated. The defendants did not knowingly participate in any breach of duty by an Isotronics employee in any respect except in joining with Greenspan in soliciting the future employment of important employees. None of the other wrongs we have listed above is a significant factor in this case.[3] The employees other than Greenspan committed no breach of duty. There is no showing that the key employees who left Isotronics for Aegis joined together to destroy Isotronics. If Scherer and Aegis had solicited the employees of Isotronics without the involvement of Greenspan prior to his departure from Isotronics, there would be no liability here.

The principle that, before he terminates his employment, a top managerial employee may not solicit the departure of employees to work for a competitor has been applied in various situations. The rule is most clearly applicable if the supervisor-manager, as a corporate pied piper, leads all his employer's employees away, thus destroying the employer's entire business. See *Barden Cream & Milk Co.* v. *Mooney*, *supra* at 546 (managers' solicitation of all employer's drivers, at-will employees, to join competitor simultaneously is a breach of duty). Although Greenspan's solicitation was directed only at certain key managerial personnel, his duty to

---

[3]The judge made findings on a few other matters that might have been or were breaches of duty, involving (it seems) minor harm to Isotronics. The plaintiffs made no point of them in their brief.

maintain at least adequate managerial personnel forbade him, while still general manager of Isotronics, from seeking to draw key managers away to a competitor. See *American Republic Ins. Co.* v. *Union Fidelity Life Ins. Co.*, 470 F.2d 820, 824 (9th Cir. 1972) (area manager's solicitation of insurance salesmen to join him in leaving plaintiff's employment to join competitor violated duty of loyalty); *Bancroft-Whitney Co.* v. *Glen*, 64 Cal. 2d 327, 347-348 (1966) (company president's liability based, in part, on soliciting plaintiff's employees to work for competitor); *Lowndes Prods., Inc.* v. *Brower*, 259 S.C. 322, 335 (1972) (plant manager who, while still employed by plaintiff, secretly hired key employees away, disrupting plaintiff's operations, violated duty of loyalty); Restatement (Second) of Agency § 393 comment e, especially illustration 1 (1958).[4] But see *Headquarters Buick-Nissan, Inc.* v. *Michael Oldsmobile*, 149 A.D.2d 302, 303 (N.Y. 1989) (director of leasing not in breach of duty of loyalty in successfully soliciting at-will leasing managers to join him in resigning and going to work for defendant corporation), and *Spring Steels, Inc.* v. *Molloy*, 400 Pa. 354, 362-363 (1960) (vice president of company who leaves with certain key employees at-will, not liable), cases in which it was not claimed that the departing executive was a general manager or chief executive who had a duty to maintain the plaintiff's managerial group. See generally on a corporate manager's breach of duty in hiring away at-will employees, Annot., 24 A.L.R. 3d 821, 841-846 (1969). The rule we ex-

---

[4]Illustration 1 states: "A is employed by P as manager for a year. Before the end of the year, A decides to go into business for himself; in anticipation of this and without P's knowledge, he contracts with the best of P's employees to work for him at the end of the year. At the end of the year, A engages in a competing business and employs the persons with whom he has previously contracted. A has committed a breach of his duty of loyalty to P."

This illustration is close to the circumstances of the case before us but not identical. None of the Isotronics employees who left to work for Aegis entered into a contract to do so while at Isotronics. Also, not every one of Isotronics's best employees joined the exodus to Aegis. Here we have understandings, but no firm commitments, by key production and sales managers.

press for the purposes of this case applies only to a general manager who, while still employed, secretly solicits key managerial employees to leave their employment to join the general manager in a competitive enterprise. Greenspan admitted that he put his loyalties to the people who were to go to Aegis ahead of his obligations as an officer of Isotronics.

The defendants argue that the plaintiffs failed to show that their wrongdoing caused any loss to the plaintiffs. In the liability portion of a bifurcated trial, the plaintiff must show that the defendant's breach of duty caused some harm for which the law provides redress because there can be no liability in the absence of causation. The judge's findings on causation are sparse and, of course, are not focused on the consequences of the breach of duty that we have identified in this opinion. We have considered the evidence and conclude that the plaintiffs have shown that the departure of the key employees whom Greenspan solicited caused some disruption of Isotronics.[5]

The plaintiffs' damages relate to negative effects on operating results that would not have occurred but for the departure of the key managerial employees. Because there is no finding or showing that Aegis would not have been financed if these key employees were not to work for it,[6] and Aegis did not sell any products until well into 1985, the plaintiffs' damages are not to be measured by Aegis's profits. The plaintiffs must prove that losses that Isotronics sustained would not have occurred but for Greenspan's breach of his duty of loyalty. These would be losses that were caused by problems arising from the departure to Aegis of key managerial em-

---

[5]Greenspan's departure itself was not a breach of duty, nor are the defendants liable for any adverse consequences of his departure. The plaintiffs were given ample notice that Greenspan would be leaving and replaced him promptly on October 1, 1984. The defendants are not liable, of course, for any adverse effects of any deficiencies of Greenspan's successors.

[6]The financing was made available without any assurance that the key employees of Isotronics, who were disclosed to the investors, would join Aegis. Indeed, one of those people did not immediately go from Isotronics to Aegis.

ployees who were approached by Greenspan while he and they were still employed by Isotronics, provided that the losses were caused by events occurring before Isotronics reasonably should have replaced the departed managerial employees with competent people. See *BBF, Inc.* v. *Germanium Power Devices Corp.*, 13 Mass. App. Ct. 166, 173 (1982).

3. We consider next other bases on which the judge concluded that the defendants were liable. We disagree with the judge's conclusions that Greenspan and Scherer made actionable misrepresentations to Isotronics and that the evidence provides an independent ground for liability based on the theory that Greenspan and Scherer intended to destroy Isotronics. There is another relatively minor issue on which we agree with the judge that liability might be imposed on the defendant Aegis.

a. On August 1, 1984, Greenspan submitted a letter of resignation to the president of Augat, sending a copy to the chairman of Augat's board of directors. In that letter, Greenspan stated, "I do not presently have any other employment plans, and therefore can stay for a period of time." The judge found that this was an affirmative misrepresentation. The statement is patently ambiguous. It is correct in that, Aegis not yet having been funded, Greenspan had no assurance of employment by Aegis. He did, however, intend to join Aegis, if it were to be funded, under terms that had been established. The statement that he could stay for a period of time points accurately toward the absence of any immediate plan to work elsewhere. In any event, Greenspan had no duty to disclose his tentative future employment plans in his letter of resignation. An employee who plans to work for a competitor of his employer has no duty to volunteer that fact, either before or after he submits his resignation. Greenspan's letter of August 1, 1984, provides no basis for the liability of the defendants.

b. The judge found that in 1984 Scherer had deliberately misrepresented his plans to reenter the packaging business to the president of Augat and to the chairman of the board of Augat, leading them to think that he was planning to enter

the ceramics, rather than the metal, packaging business. Scherer had no duty to tell Augat what his plans were, nor did he have any duty not to mislead them. The evidence on which the judge's findings are based discloses no material misrepresentations on which Augat reasonably could have relied. Scherer had revealed that he might be a prospective competitor of Augat and Isotronics. His comments and the circumstances, including Greenspan's disclosure to Augat that he might join Scherer, should have put Augat and Isotronics on guard rather than at ease.

c. We reject, as an independent basis for liability, the judge's conclusion that the defendants intended to cripple Isotronics in order to ease Aegis's entry into the market. We have already identified the circumstances under which the defendants are liable for Greenspan's breach of duty.[7] There is no other significant respect in which the defendants may be held liable. They had an absolute right to compete with Isotronics. The possibility of crippling, or even destroying, a competitor is inherent in a competitive market. The defendants' state of mind in engaging in competition does not alone provide a basis for liability. See Restatement of Unfair Competition § 1, comment c (Tent. Draft No. 1 1988).

d. When Isotronics's engineering manager left in January, 1985, with full disclosure, he took a notebook that he had compiled containing certain information. He left copies behind at Isotronics. There is no evidence that the defendants knew about the notebook. The plaintiffs want the notebook and copies of it returned. The judge ruled that certain information in the notebook was confidential and that Aegis should return the notebook and copies. There is no evidence that Aegis's use of the notebook caused any harm to the plaintiffs or benefited the defendants in any significant way. A judgment directing Aegis to deliver the notebook and any copies to Isotronics should be entered.

---

[7]As to this unlawful conduct, we agree with the judge that the defendants' conduct was a wilful and knowing violation under G. L. c. 93A, §§ 2 & 11 (1988 ed.).

4. The case is remanded to the Superior Court for proceedings consistent with this opinion.

*So ordered.*