In re GOLDEN DISTRIBUTORS, LTD., Capital Cigar and Tobacco Company, Incorporated, et al., Debtors.

GOLDEN DISTRIBUTORS, LTD., Capital Cigar and Tobacco Company, Incorporated, Plaintiffs,

v.

AUBURN MERCHANDISING DISTRIBUTORSHIP, INC., Three Unknown Officers/Directors/Employees of Auburn Merchandise Distributors, Inc., Joseph Pelletier, Michael Benson, John Fanning, Albert Haslam, Robert Hornby, Anthony Mambro, Beverly Mello, James O'Neill, Luke Regan, and Francis Sullivan, Defendants.

Bankruptcy Nos. 90 B 21146–90 B 21149 and 91 ADV. 6167.

United States Bankruptcy Court, S.D. New York.

Nov. 12, 1991.

Summit Solomon & Feldesman, New York City (John L. Amabile and Anna M. Hanrahan, of counsel), for plaintiffs.

Snow Becker Krauss P.C., New York City (Alan Van Praag, Francis V. Imbornone, and William D. Hummell, of counsel), for defendants.

## DECISION ON MOTION FOR PRELIMINARY INJUNCTION

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The debtor, Golden Distributors, Ltd. ("Golden"), seeks a preliminary injunction restraining the defendants, Auburn Merchandise Distributors, Inc. ("AMD"), and ten former employees of the debtor now employed by AMD from unfairly competing with the debtor and soliciting business from customers who formerly dealt with the debtor. The requested preliminary injunctive relief relates to an adversary proceeding commenced in this court by the debtor against the defendants for a permanent injunction and for conversion of property of the debtor's estate.

The complaint alleges that the debtor is engaged in the business of distributing tobacco, candy and grocery related products and other sundry items throughout the northeastern United States, including Massachusetts and Rhode Island. AMD is a competitor of the debtor in the distribution of these items. The debtor maintains a facility in Mansfield, Massachusetts where ten of the individual defendants who had previously worked for the debtor had been employed. The defendant, AMD, maintains a warehouse facility in Whitensville, Massachusetts. The ten individual defendants previously operated out of the debtor's Mansfield Division and handled the debtor's sales activities for the northeastern states, including the State of Rhode Island. They now perform the same service in the same territory for AMD, which previously did not have sales representatives working in Rhode Island.

The complaint alleges that AMD induced the debtor's sales manager for the northeastern territory, Joseph Pelletier ("Pelleti-

er") to solicit and raid all of the debtor's Rhode Island sales representatives for employment by AMD, in breach of his duty of loyalty to the debtor, with the result that Pelletier and all but one of the other individual defendants resigned en masse and joined AMD. The sales people then proceeded to solicit the same customers for AMD which they had previously serviced while working for the debtor. The complaint also alleges that while still in the debtor's employ, the ten individual defendants persuaded customers of the debtor to transfer their business to AMD, in whole or in part, after the ten individual defendants commenced work for AMD, with the result that the debtor has lost over $500,-000.00 in business and AMD has taken over a substantial portion of the debtor's non-chain Rhode Island business in that market.

On October 3, 1991, this court entered a temporary restraining order enjoining the defendants from soliciting or doing any business with any entities or businesses which were customers of the debtor. The debtor posted a certified check drawn on an escrow fund held by the debtor's attorneys in the sum of $175,000.00, later increased to $250,000.00, in lieu of a bond in support of the temporary restraining order.

The debtor's preliminary injunction proceeding commenced on October 21, 1991 and continued on November 5, 1991, during which time the temporary restraining order continued in effect.

## FINDINGS OF FACT

1. The debtor, Golden, and its affiliated company, Capital Cigar and Tobacco Co., Inc., filed with this court on November 13, 1990, separate petitions for relief under Chapter 11 of the Bankruptcy Code and were continued in possession and management of their businesses and properties as debtors in possession pursuant to 11 U.S.C. §§ 1107 and 1108. The separate cases were consolidated for administration purposes only. Golden's principal offices are located in Hauppauge, New York. It also operates a facility in Portchester, New York.

2. Golden maintains a business facility in Mansfield, Massachusetts known as the Mansfield Division. Ten of the individual defendants were formerly employed by Golden's Mansfield Division until they resigned in September of 1991, at which time they went to work for the corporate defendant, AMD. Of the ten individual defendants formerly employed by Golden, nine resigned on September 20, 1991 and one, Beverly Mello, resigned on September 19, 1991. Golden did not have non-competition agreements or restrictive covenants with any of the individual defendant sales people. All of Golden's sales people in question were at-will employees.

3. AMD maintains its principal place of business in Whitensville, Massachusetts. William Potvin ("Potvin") is the president of AMD.

4. In November of 1990, the debtor's former president contacted defendant AMD to determine if AMD was interested in acquiring some of the debtor's assets. AMD's president, Potvin, met with the debtor's former president and received a written proposed retainer agreement and some financial information as to the debtor's sales and inventory. The negotiations did not produce any results.

5. In December of 1990, AMD's president, Potvin, called the debtor's sales manager, Pelletier, and informed Pelletier about the positive aspects of working for AMD. Pelletier had the first of many meetings with Potvin concerning transferring Pelletier's services to AMD. Other competitors of Golden had also contacted Pelletier about leaving Golden after it filed its Chapter 11 petition on November 13, 1990.

6. About two months later, Pelletier called Potvin and arranged for a second meeting. Pelletier told Potvin that other sales people of the debtor's Mansfield Division were also unhappy about working for the debtor. Potvin told Pelletier that AMD was planning on establishing a much larger warehouse because AMD was a growing business and was interested in expanding its activities.

7. Pelletier thereafter spoke to four of the individual defendants, who were sales representatives for the debtor in Rhode Island, and informed them about his meetings with Potvin. Pelletier told them he was going to meet with Potvin again and that they were welcome to come and meet Potvin concerning job opportunities with AMD. Pelletier told the other four defendants that they could decide for themselves if they wanted to work for AMD. Thereafter, they all met with Potvin. After the meeting, Potvin telephoned Pelletier and said he was impressed and hoped that the debtor's four sales people were also impressed with AMD. Pelletier also thanked the sales people for coming to the meeting to meet AMD's president, Potvin.

8. Following Pelletier's third meeting with Potvin and the debtor's four former sales people, Pelletier spoke at different times with other sales people employed by the debtor at its Mansfield Division who covered the northeastern territory, including Rhode Island, for the debtor. Pelletier then communicated to Potvin the names of the debtor's Mansfield Division sales people who might be interested in working for AMD. Pelletier also set up a meeting between Potvin and two of the debtor's other sales people at the Mansfield Division, Julian Beaulieu and defendant Albert Haslam. Pelletier also introduced Potvin to Albert Vilela ("Vilela"). Defendant Beverly Mello was introduced to Potvin by Vilela who she had worked with at another wholesaler prior to her employment at Golden.

9. The meetings between Potvin, Pelletier and the sales people took place at two restaurants, the Venus de Milo and Evelyn's, located in Massachusetts and Rhode Island, respectively. Pelletier was not present at the meeting between Beverly Mello and Potvin at the Venus de Milo.

10. By June of 1991, as a result of Pelletier's introductions, Potvin had met with all of the debtor's former Mansfield Division sales people who later left their employment at the same time on September 20, 1991, except Vilela, whose employment was terminated by Golden two weeks earlier, and Mello, who quit on September 19, 1991. Potvin explained that AMD was growing, that it was opening a larger warehouse, that it would offer each salesperson a new automobile and that the employee benefits of AMD were as good as any in the industry. In addition, Potvin sent brochures describing AMD to the defendant sales people while they were still employed by Golden.

11. In June or July of 1991, Pelletier informed the debtor's sales people at the Mansfield Division that he had decided to go to work for AMD, where he would be a sales manager for the New England territory, including Rhode Island. Pelletier and Potvin agreed upon Pelletier's compensation package two weeks before Pelletier had resigned from his job as the debtor's northeastern sales manager on September 20, 1991. Pelletier delayed joining AMD sooner because he wanted to wait until the new warehouse was ready, although Pelletier informed Potvin two months previously that he had decided to leave the debtor's services and join AMD.

12. Several weeks before all of the individual defendants quit their jobs with the debtor, all of them, except defendant Sullivan, visited AMD's new warehouse and met with Potvin, who had mailed to them folders of printed information about AMD and its business. Pelletier had also informed the other defendant sales people that he would quit his job with Golden.

13. On Friday, September 20, 1991, Pelletier informed the debtor without any advance notice that he resigned his employment. The other individual defendant sales people, except Mello, resigned en masse that day and followed Pelletier to AMD. Mello resigned on September 19, 1991 and accepted employment at AMD via a telephone call on September 20, 1991 while she was attending her son's wedding in Pennsylvania.

14. The evidence reveals that shortly before some sales people resigned, they communicated with customers that they would be leaving. Some identifeid AMD as their new employer, but some did not. The inference is that new orders were to be submitted to their new employer. None of

the sales people solicited customers for AMD while still working for Golden.

15. The individual defendant sales people did not discuss with each other their decision to leave Golden, although some did discuss this subject with family members.

16. On Saturday, September 21, 1991, Pelletier and the individual defendant sales people who quit the debtor, other than Mello, who quit the debtor met with Potvin at the AMD's new warehouse. Potvin requested information from them as to the names of customers they previously serviced, the prices charged, credit terms, delivery days and other relevant information which could be computerized to prepare for their sales activities as AMD sales people. This information came from vacation lists prepared by the sales people for the purpose of servicing their customers while the sales people were on vacation. These lists contained information which specified the name and address of the customer, the contact person at the customer's location, the prices, the credit terms, and product mix. This information is based upon the sales peoples' experience in servicing their customers.

17. Potvin admitted he knew the customers serviced by the debtor's former sales people would follow them to AMD, which they did. For the first week after September 20, 1991, AMD's gross sales for Rhode Island increased by $408,800.00. Most of the customers serviced by the defendant sales people were the same customers they had previously serviced for predecessor companies which were acquired by Golden as a result of previous acquisitions.

18. Immediately after the ten individual defendants resigned, the debtor had no sales people covering the Rhode Island territory. The debtor's sales volume for Rhode Island dropped approximately sixty percent. Three weeks later, the debtor's sales volume was fifty percent of the sales figures before the individual defendant sales people quit their jobs with the debtor. The debtor's sales volume in Rhode Island is currently approximately forty-seven percent of the pre-September 20, 1991 volume.

Following the September 20, 1991 resignations, Golden has hired six sales people to service the area previously covered by the individual defendant sales people.

## DISCUSSION

Golden seeks to convert the temporary restraining order it obtained from this court on October 3, 1991 into a preliminary injunction. To obtain a preliminary injunction, the moving party must establish: (1) that it will suffer irreparable harm and (2) either (a) likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping in favor of the moving party. *JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir.1990); *Church of Scientology International v. The Elmira Mission of the Church of Scientology*, 794 F.2d 38, 41 (2d Cir.1986); *Power Test Petroleum Distributors v. Calcu Gas*, 754 F.2d 91, 95 (2d Cir.1985).

■■■ Before this court can determine the merits of the underlying action, it must decide which state's substantive law to apply. Because New York is the forum state, this court must rely upon New York's choice of law rules to determine which state's substantive law applies. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Machleder v. Diaz*, 801 F.2d 46, 51 (2d Cir.1986), *cert. denied*, 479 U.S. 1088, 107 S.Ct. 1294, 94 L.Ed.2d 150 (1987). Under New York choice of law principles, this court must apply the substantive tort law of the state having the most significant relationship with the occurrence and with the parties. *Babcock v. Jackson*, 12 N.Y.2d 473, 482, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963). *See American Protein Corp. v. AB Volvo*, 844 F.2d 56, 62–63 (2d Cir.) (New York substantive law applied because acts constituting the alleged tort occurred in New York and New York corporation was implicated), *cert. denied*, 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988).

■■■ In the present case, the defendant, AMD, is a Massachusett's corporation with

its principal place of business in Whitensville, Massachusetts. Furthermore, Golden's affected subdivision is located in Mansfield, Massachusetts. Finally, many of the acts constituting the alleged tort, the discussions between Potvin, Pelletier and the employees and Pelletier and the employees, occurred in Massachusetts, much of the time at the Venus de Milo in Swansea, Massachusetts. Consequently, this court must apply the substantive tort law of Massachusetts in resolving the claims.

### Likelihood of Success on the Merits under Massachusetts Law

#### The Individual Defendant Sales People

The plaintiff, Golden, concedes, and the law is well-settled, that an employee at-will may properly plan to compete with his employer and may actively pursue such an objective while still employed. *Meehan v. Shaughnessy*, 404 Mass. 419, 435, 535 N.E.2d 1255 (1989). An employer may restrict post-employment competition by its employees through non-competition agreements. *See All Stainless, Inc. v. Colby*, 364 Mass. 773, 778, 308 N.E.2d 481 (1974). Public policy considerations "strongly oppose[ ] constraints upon this free choice, where, as here, the individuals are at-will employees and have entered into no agreements with plaintiff not to compete." *Augat, Inc. v. Aegis, Inc.*, No. 19760, at 86 (Sup.Ct.Mass. filed Mar. 27, 1986).

Moreover, Golden has not alleged, nor was there any evidence offered at the hearing on the preliminary injunction, as to whether the independent defendant sales people conspired amongst themselves to leave en masse. To the contrary, the uncontroverted testimony of the sales people was that each one made the decision to leave Golden after discussing his or her decision with family members and not with other sales people. In the instant case, there was no proven "conspiracy" to leave the employer en masse, an event that other courts have held actionable. *Chelsea Industries, Inc. v. Gaffney*, 389 Mass. 1, 449 N.E.2d 320 (1983). *See also Wear–Ever Aluminum, Inc. v. Townecraft Industries,*

*Inc.*, 75 N.J.Super. 135, 182 A.2d 387 (Ch. Div.1962).

Golden's complaint for injunctive relief states that the individual sales people, while still in Golden's employ, communicated with Golden's customers and persuaded those customers to cease doing business with Golden and transfer their business to AMD. There was no credible proof that any of the individual defendant sales people obtained any orders for AMD while still employed by Golden. At most, they communicated to their customers that they were leaving Golden's employ and that they would return the following week in their new capacities. The evidence established that if they did not actually visit the customers premises for new business, the customers would simply telephone in their orders to Golden. The inference to be drawn from this conduct is that when the sales people went to work for a new employer, the telephone orders should be submitted to the individual defendants' new employer rather than Golden. This conduct alone does not constitute obtaining business for AMD while they were still employed by Golden. Manifestly, the individual defendant sales people were entitled to notify their customers that they were leaving Golden, and the customers were free to decide to whom they wished to submit their purchase orders for the following week.

The limitations on the general rule that an employee may compete with his employer were stated in *Augat* as follows:

> There are, however, certain limitations on the conduct of an employee who plans to compete with his employer. He may not appropriate his employer's trade secrets. See *Eastern Marble Products Corp. v. Roman Marble, Inc.*, 372 Mass. 835, 838–42, 364 N.E.2d 799 (1977). He may not solicit his employer's customers while still working for his employer (see *Chelsea Indus., Inc. v. Gaffney*, 389 Mass. at 11–12, 449 N.E.2d 320, and he may not carry away certain information, such as lists of customers (*New England Overall Co., Inc. v. Woltmann*, 343 Mass. 69, 77, 176 N.E.2d 193 [1961]).

*Augat, Inc. v. Aegis, Inc.*, 409 Mass. 165, 172–73, 565 N.E.2d 415, 419–20 (1991).

The limitation with respect to at-will employees at issue in the present case is whether the individual defendant sales people took with them confidential information maintained by Golden, such as customer lists, credit terms and price schedules. Golden argues that the vacation lists drafted by the employees were confidential, and therefore the employees should not have given those lists to Potvin and AMD.

The sales people testified that they prepared the vacation lists from memory. Furthermore, they stated that the information contained in those lists, such as the names and addresses of their customers, price data, product mix, credit terms, and contact people at each customer's location, is readily ascertainable from other sources. For example, the names and addresses of customers may be obtained from the yellow pages in telephone directories, trade manuals and word of mouth. The information regarding product mix may be obtained by simply visiting a customer's location. Moreover, credit terms and prices are quickly offered by customers, who will show invoices containing this information to sales people from competing distributors in order to receive lower prices on many products. There is also not one scintilla of evidence that Golden made any effort to guard against the release of the information contained on the vacation lists. To the contrary, the sales people testified that they, for their own proprietary interests, refused to disclose to competitors the information on their vacation lists. The sales people also stated that they encountered competitor's sales people on a daily basis at their own customers establishments. This indicates that the information in question was already known by other competitors already servicing the same customers.

This court has already held in a separate adversary proceeding in this case that lists of Golden's customers are not secret in that the names and addresses "are well-known and are also listed in the yellow pages of the telephone book." *In re Golden Distributors, Ltd.*, 122 B.R. 15, 17 (Bankr.S.D.N.Y.1990). *See also In re Golden Distributors, Ltd.*, 128 B.R. 352, 362 (Bankr.S.D.N.Y.1991) ("[C]ustomers and prices in the paper products industry [are] readily available to the manufacturers and [are] not trade secrets.").

■ Courts in Massachusetts have long held that even where an employee's contract does not contain an express provision prohibiting that employee from using or disclosing information obtained in the course of employment, the employee may be enjoined from using or disclosing confidential information so acquired, although the employee may utilize general skill or knowledge acquired during the course of the employee's tenure. This is due to the obligations that arise out of the very existence of an employer-employee relationship. *Woolley's Laundry, Inc. v. Silva*, 304 Mass. 383, 23 N.E.2d 899 (1939). Massachusetts courts have adopted six factors set forth in the Restatement of Torts in order to determine whether the information in question is confidential:

(1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and to his competitors; (5) the amount of effort or money expended by the employer in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Jet Spray Cooler v. Crampton*, 361 Mass. 835, 282 N.E.2d 921, 924–25 (1972) (citing Restatement of Torts § 757, comment (b)). *See Glosband v. Watts Detective Agency, Inc.*, 21 B.R. 963, 973 (D.Mass.1981) (applying same standard).

■ Massachusetts courts have consistently held that the solicitation of a former employer's customers based on either the employee's memory of the customers or written customer lists constitutes no breach of any duty owed the employer. *Jet Spray Cooler*, 361 Mass. 835, 282 N.E.2d

921; *Woolley's Laundry,* 304 Mass. 383, 390–91, 23 N.E.2d 899, 903; *Padover v. Axelson,* 268 Mass. 148, 167 N.E. 301 (1929). As the *Padover* court stated, individuals in the business of soliciting "may use their knowledge of the trade. Their acquaintance with the customers, their skill and intelligence as salesmen were not surrendered to the plaintiff." *Padover,* 167 N.E. at 302.

■ Applying the six factors relevant to the question of whether the information on the vacation lists is confidential, this court finds that the information is not confidential. The information was easily acquired, as noted above. The names, addresses and contact people were known outside of the business because the sales people met competitors' sales people at the customers' locations on a daily basis. Further, there was no proof that Golden took any measures to guard the secrecy of the information. This point was emphasized in *J.T. Healy & Son, Inc. v. James A. Murphy & Son, Inc.,* 357 Mass. 728, 260 N.E.2d 723, 730–31 (1970), where the court stated that

> one who claims that he has a trade secret must exercise eternal vigilance. This calls for constant warnings to all persons to whom the trade secret has become known and obtaining from each an agreement, preferably in writing, acknowledging its secrecy and promising to respect it.

*Id.* 260 N.E.2d at 730–31.

Therefore, the individual defendant sales people were free to leave Golden when they did and to solicit thereafter the customers they had previously serviced for Golden without incurring any liability to Golden for such conduct, which is neither enjoinable nor compensable in damages. Accordingly, the defendants' motion to dismiss the complaint against the individual sales people should be granted.

### Pelletier, the Corporate Pied Piper, and Potvin

■ The reason this case differs from the general rule with respect to the right of at-will employees to compete with their for-mer employer is the fact that in the instant case, the employees were solicited by Pelletier, Golden's district sales manager while he was still employed by Golden and receiving compensation from Golden. It is precisely this conduct on the part of Pelletier which constitutes a breach of his fiduciary duty of loyalty to Golden, his then employer. Additionally, Potvin was aware of Pelletier's solicitations and indeed, encouraged him to make arrangements for Potvin to meet the individual defendant sales people for the purpose of inducing them to join AMD. Potvin was free to attempt to solicit their services and the defendant employees were free to accept employment by AMD without incurring any liability to Golden, absent the additional factor involving Pelletier's breach of his fiduciary duty to Golden. *Augat, Inc. v. Aegis, Inc.,* 409 Mass. 165, 565 N.E.2d 415 (1991); *Meehan v. Shaughnessy,* 404 Mass. 419, 535 N.E.2d 1255 (1989); *Padover v. Axelson,* 268 Mass. 148, 167 N.E. 301 (1929).

■ Pelletier did not wait until he resigned to commence recruiting for AMD. While still employed by Golden as a district sales manager, he occupied a position of trust and confidence and owed a duty of loyalty to Golden to protect the interests of his employer. *Augat,* 409 Mass. 165, 565 N.E.2d 415; *Chelsea Industries, Inc. v. Gaffney,* 389 Mass. 1, 449 N.E.2d 320 (1983); *Barden Cream & Milk Co. v. Mooney,* 305 Mass. 545, 26 N.E.2d 324 (1940).

> Of course, such a person may not act for his future interests at the expense of his employer by using the employer's funds or employees for personal gain or by a course of conduct designed to hurt the employer.

*Augat,* 409 Mass. at 173, 565 N.E.2d at 420.

The instant case is strikingly similar to the facts in the *Augat* case where a managerial employee solicited the departure of employees to work for a competitor while he was still employed by the plaintiff. In *Augat,* the employees were key technical personnel employed by an electronics firm. Although the individual defendant sales people in the instant case were not key

technical or managerial personnel, they were key sales people with respect to the territories they serviced. The solicited employees in *Augat* were not held liable for the managerial employee's breach of his duty of loyalty. The competing firm and the managerial employee were answerable in damages for their participation in the proscribed conduct. The *Augat* court expressed this rule as follows:

The principle that, before he terminates his employment, a top managerial employee may not solicit the departure of employees to work for a competitor has been applied in various situations. The rule is most clearly applicable if the supervisor-manager, as a corporate pied piper, leads all his employer's employees away, thus destroying the employer's entire business. *Augat*, 409 Mass. at 173, 565 N.E.2d at 420 (citation omitted).

■ While Golden has established a strong likelihood of success on the merits against AMD and Pelletier, the balance of hardships does not tip in favor of enjoining the individual defendant sales people from soliciting business from the customers they formerly serviced for Golden because they were free to join AMD and compete with Golden, notwithstanding Pelletier's breach of his fiduciary duty. The individual sales people had not breached any fiduciary duty to Golden and should not be financially prejudiced as result of the joint conduct of Pelletier and Potvin. Thus, an injunction directed against AMD, which restrains AMD from soliciting business from the customers formerly serviced by the individual defendant sales people while they were employed by Golden, would adversely affect their unquestioned right to solicit these customers without incurring any liability to Golden for such competition.

The "irreparable harm" required to sustain a preliminary injunction is absent in this case because the harm Golden has suffered may be adequately compensated by an award of monetary damages for Pelletier's breach of fiduciary duty and AMD's participation in such breach through the conduct of Potvin. The balance of hardships tip in favor of permitting the individual defendant sales people to continue to compete with Golden for the business of the customers they previously serviced, as authorized by the well-settled case law. Therefore a preliminary injunction restraining AMD from servicing these customers will violate the individual defendants' rights to compete with Golden while they are employed by AMD. The consequences of a preliminary injunction directed against AMD would force the individual sales people to seek employment elsewhere, which may not be available at this time because of the present economic situation and the age of some of the individual defendants.

On the other hand, Golden may be compensated adequately by an award of money damages which would cover past losses and the loss of future profits directly attributable to Pelletier's breach of his fiduciary duty. The harm sustained in the instant case is Golden's loss of its sales people in the northeast territory in question and the immediate loss of business from customers in that territory who continued their allegiances to the sales people who joined AMD. Golden cannot claim the loss of customers as property of the estate, absent exclusivity agreements between Golden and the customers, because such customers and Golden's relationship with such customers do not constitute property of the estate within the meaning of 11 U.S.C. § 541. *In re Golden Distributors, Ltd.*, 122 B.R. 15, 20 (Bankr.S.D.N.Y.1990).

■ If a monetary award may constitute adequate compensation for the harm sustained, a preliminary injunction should not be issued, notwithstanding that the plaintiff establishes a strong likelihood of success on the merits as Golden has shown in this case. *In re Golden Distributors, Ltd.*, 122 B.R. 349, 361 (Bankr. S.D.N.Y.1991). Hence, Golden's request for a preliminary injunction is denied and the temporary restraining order directed against the remaining defendants, AMD, its officers and Pelletier, is terminated. The adversary complaint against these remaining defendants and the request for damages resulting from the breach of fidu-

ciary duty, which this court has found, will be set down for trial.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(E).

2. Golden has not established that the individual defendant sales people solicited customers for AMD prior to their resignations from Golden or that they appropriated any confidential information, trade secrets or property of the estate belonging Golden.

3. The defendants' motion to dismiss the complaint as to the individual defendant sales people, other than Pelletier, is granted.

4. Golden's application for a preliminary injunction restraining the remaining defendants from soliciting the customers formerly serviced by the defendant sales people is denied because the balance of hardships tip in favor of allowing the defendant sales people to continue soliciting such customers as authorized by law, and because monetary damages will adequately compensate Golden for the harm resulting from Pelletier's breach of fiduciary duty and Potvin's knowing participation in such breach.

5. The temporary restraining order previously issued by this court enjoining the defendants from soliciting the customers formerly serviced by the individual defendant sales people is terminated.

SETTLE ORDER in accordance with the foregoing.