Hinkle, J.
Plaintiff
William Gallagher Associates Insurance Brokers, Inc. seeks damages and injunctive relief from defendants Albert Everts, II and InterContinental Insurance Brokers, LLC (“InterContinental”). Plaintiff claims defendants misappropriated confidential business information and trade secrets and solicited plaintiffs customers.[2] The matter is now before the court on defendants' motion for summary judgment. After a hearing, for the reasons set forth below, this motion is ALLOWED.

BACKGROUND

The undisputed material facts as established by the summary judgment record are as follows.[3]
Everts began working for Frank B. Hall & Co. of Boston (“Hall & Co.”) in or around 1985. At Hall & Co., Everts was an account manager.[4] In this capacity, he did not sell insurance but issued certificates of insurance, sent out policies and made proposals. The nature of Everts’ work as an account manager was generally the same as the work of a “producer" but differed in that a producer is ultimately responsible for the accounts.[5] Everts performed work for two clients of Hall & Co. while there, Sasaki Associates arid Envirogen.
Everts was involved in the environmental and professional liability insurance business at Hall & Co. Everts provided insurance and risk management services for environmental and professional liability risks. He would consult with clients and prospective clients concerning their insurance and then receive quotes from insurance companies for the clients. Everts also generated insurance manuscript and policy forms.
The potential market for environmental insurance and professional liability products includes hospitals, landfills, industry, manufacturing, laboratories, dry cleaners, automobile repair shops, junkyards, restaurants, supermarkets, shopping malls, gas stations, apartment buildings, farms and entities buying commercial properties. The insurance product Everts sold to such clients and the insurers providing that insurance product are well known in the industry. Everts was not in any special position to receive the quotes he obtained, because they are available to anyone with the relevant information about the client or potential client.[6]
In 1992, Everts moved to California and worked as a producer for the Crowell Insurance Agency of Orange County. After leaving that agency, Everts worked for Marsh & McLennan in 1993 for several months as a producer. Everts maintained contact with Sasaki Associates and Envirogen.[7]
In August 1993, Everts became a producer with Minet Insurance Services, Inc., a subsidiary of Minet, Inc., and worked in Los Angeles. Everts believes that at that time he required no additional training to work as a producer. He did, however, take courses to maintain his license as a property casualty broker.
Upon joining Minet Insurance Services, Inc., Everts signed a restrictive covenant agreement (the ”1993 agreement")[8] with Minet International Professional Indemnity Brokers, Inc. (a sister corporation of Minet Insurance Services, Inc.).[9] Only Everts’ signature appears on the 1993 agreement; this agreement was not signed by any representative of Minet Insurance Services. At the time Everts signed the 1993 agreement, Mike Newman, Senior Vice President of Minet Insurance Services, Inc., told Everts that this agreement would never be enforced by Minet Insurance Services, Inc., because non-competition agreements are unenforceable in California.[10]
In or around February 1996, Minet, Inc. sent Everts (in California) an offer letter[11] and another restrictive covenant agreement (the “1996 agreement”). Everts signed the 1996 agreement and sent it to Minet, Inc. in New York. The 1996 agreement provided a signature line for a representative of the William Gallagher Associates Insurance Agency, Inc. That company, a Massachusetts corporation, was owned by Minet, Inc., and changed its name to Minet Insurance Brokers, Inc. in 1996. Through a series of sales and name changes, William Gallagher Associates Insurance Agency, Inc. and Minet Insurance Brokers, Inc. became the plaintiff in this action.[12] No representative of Minet, Inc. or the William Gallagher Associates Insurance Agency, Inc. signed the 1996 agreement.
The offer letter stated that Everts’ relocation to Boston would be contingent on receipt of the completed 1996 agreement. The 1996 agreement, nine pages in length, states that it is an agreement between Everts and William Gallagher Associates Insurance Agency, Inc. and its parents, subsidiaries, successors, affiliates and assigns.[13] The space provided for the date of the agreement is left blank. The agreement contains “mutual recitals.”[14]
In April 1996, Everts worked as a producer in the Boston office of Minet Insurance Brokers, Inc. The cost of Everts’ move to Boston was covered by St. Paul Insurance Co.[15] Approximately one year later, in May 1997, Minet Insurance Brokers, Inc. (by way of its ownership by Minet, Inc.) was sold to Aon Corporation. In August 1997, the management of the Boston office reacquired ownership of the office, and renamed it William Gallagher Associates Insurance Brokers, Inc. See supra n.12. While Everts was aware of these corporate purchases and name changes, he was not informed of specific details regarding those transactions or their impact on Everts’ employment contracts. When he began working for Minet Insurance Services, Inc., Everts was aware that that corporation was one of a number of related corporations, but he did not know the exact corporate relationship.
Working for Minet Insurance Brokers, Inc. and then for the plaintiff, Everts provided insurance and risk *718 management services for environmental and professional liability risks. He consulted with clients and prospective clients concerning their insurance and obtained insurance quotes from insurance companies for the clients. The quotes he received were obtainable by any person with the relevant information from the client. Everts also generated insurance manuscript and policy forms. The skills Everts used to perform these functions were skills that he acquired before working for plaintiff or plaintiffs predecessors, but he was still required to attend courses to maintain his license. The duties Everts performed were generally the same in Boston as they were in California.
Everts received some necessary assistance in performing his job with plaintiff (and Minet Insurance Brokers, Inc.). Specifically, Everts received assistance from persons in the typing pool (although he did much of his own typing), from account managers who performed necessary clerical tasks for Everts and from other support staff members.[16] Everts’ office supplies were provided by the company. Everts also received assistance from Philip Edmundson, who brought Everts with him to. sell insurance to Instron Corporation. Everts and Edmundson were successful in selling environmental insurance to Instron. However, Everts has had no contact with Instron since he left his employment with plaintiff, and Instron Corporation has never become a client of InterContinental. Edmundson also accompanied Everts on a visit to a representative of Bank of Boston, but this visit did not generate any business for plaintiff, and there is no evidence Bank of Boston ever became a client of InterContinental. In addition, Everts was accompanied by a young assistant on client visits on four or five occasions, but Everts is unaware of any instance in which the assistant’s presence substantially helped to create a customer relationship, and plaintiff offers no evidence to contradict this. Finally, one newsletter was sent to clients and potential environmental clients by plaintiff as a marketing tool. Everts wrote this newsletter. Everts is unaware of any instance in which the newsletter helped him obtain business, and there is no evidence that the newsletter played any role in generating any business.
While working for plaintiff and Minet Insurance Brokers, Inc., Everts attended a Miller Heiman sales training program. Plaintiff paid for Everts to attend that program.[17] Everts had attended three other Miller Heiman sales training programs with previous employers, beginning in or about 1990.[18] This training program, along with the courses to maintain his license, are the only evidence before me of training of Everts while working for Minet Insurance Brokers, Inc. and plaintiff.
Everts does not recall any verbal or written statements being given to him regarding what type of client information should be kept confidential. No instruction was given to Everts as to how to keep information confidential. Plaintiff provided Everts with a laptop which Everts believes (and plaintiff has not contradicted this belief) encouraged Everts to bring client information, documents and flies outside the office. Everts was never instructed not to create a customer list. To Everts’ knowledge, no documents relating to clients or to services provided to clients were marked “confidential” or “trade secret” or contained any other mark requiring confidentiality. Because they were not locked, files were accessible to any person in the office including support personnel. The office was not partitioned to prevent other nonessential personnel from viewing the documents.
Everts received a base salary from plaintiff and had the potential to receive a bonus based upon new business brought in.
Everts left plaintiff in November 1998 because he did not believe plaintiff was adequately servicing the clients whose accounts Everts handled and because he was “rendered invisible,” by which Everts means that he was excluded from a sales incentive program whereby commissions were earned and was not offered an equity position or given raises in pay.[19]
On November 5, 1998, Everts accepted InterContinental’s offer of employment as a producer. Everts submitted his resignation to plaintiff in a memorandum dated November 13, 1998.
Everts informed some of the clients whose accounts he handled that he would be leaving employment with plaintiff. Everts did not urge these customers to leave plaintiff or solicit them to transfer their policies to InterContinental. Everts did not disparage plaintiff or state that InterContinental would be a better agency. Some customers told Everts that they wanted to continue doing business with him.
After leaving plaintiffs employ, Everts did not utilize any customer list of plaintiff to solicit clients. Everts did not consult such a list to generate potential customers. Everts did not generate a list of clients whose accounts he serviced working for plaintiff, either before or after leaving plaintiffs employ. Everts remembered the clients whose accounts he serviced while in plaintiffs employ. This consisted of approximately 25 customers. Everts had had experience with most of these customers for many years.
However, Everts did take a memorandum from plaintiff to various employees, dated November 9, 1998, regarding potential minimum revenue requirements. Attached to this memorandum was a list of approximately 200 client accounts. The memorandum states that these accounts generate less than $5,000 in revenue. According to the memorandum, in most cases the revenues generated by those accounts “do not nearly compensate for the work/service provided” by plaintiffs staff. In addition, the memorandum states:
*719 Please review the list with the understanding that it is very possible that we will be implementing minimum revenue requirements for all future business as well as existing accounts as they approach renewal. Understand that no such decision has been made to date, but serious consideration will be given to the idea over the next few days/weeks. I would like you to pay particular attention to any account that has been on the books for 3 years or more which has shown no discernible growth or potential for growth. We may require that these accounts be assessed a fee or that they find another broker (in a nice way, of course!).
(Emphasis in original.) Everts does not make any money on accounts of $5,000 or less.
When he joined InterContinental, 13 of the clients whose accounts he had serviced working for plaintiff elected to continue their business relationship with Everts, terminating all or substantially all of their business relationship with plaintiff. Everts brought two of these clients, Sasaki Associates and Envirogen, to Minet Insurance Services, Inc. in 1993 and 1994.[20] Everts had developed social relationships with some of the principals of these two companies, who played golf with Everts and attended Everts’ wedding in 1998. Four clients whose accounts Everts serviced, Acme Solvents, Midco Remedial Corp., Organic Chemicals and Verona Well Field, became clients while Everts was with Minet Insurance Services, Inc. in California. The remaining seven were clients whose accounts Everts serviced while be was a producer in the Boston office.
Everts does not believe he has brought any former customers of plaintiff to InterContinental, other than clients whose accounts Everts personally serviced.[21] Plaintiff has offered no evidence to contradict this belief. At Everts’ suggestion, both Sasaki Associates and Envirogen have kept some accounts with plaintiff, including Sasaki’s employee benefits policies and Envirogen’s directors and officers policies. The insurance Everts writes for these 13 companies is “fairly similar” to the insurance he wrote when working for plaintiff.
When he informed these clients that he was with InterContinental, Everts did not use any specific, insider information as to whether the customers were susceptible to changing agencies (e.g., pending proposals or expiration data premium amounts). Everts only called persons within those companies and informed them he had left plaintiffs employ.[22]
With one exception, Everts personally solicited each of the clients who went with him to InterContinental. Those companies did not become clients through any document, referral or other resource provided by plaintiff. The exception is Environmental Project Control, which was a house account of plaintiff assigned to Everts.
After leaving plaintiff, Everts did not contact or solicit GEI consultants, Enventures Capital or Glendale Environmental. To Everts’ knowledge (uncontradicted by plaintiff), none of those companies became customers of or were contacted by InterContinental. These accounts were not “parked” at another broker, in that Everts does not now receive commissions or benefits from these accounts and has not since leaving plaintiff. In addition, Everts has no arrangement to receive benefits from these accounts in the future. He does not know what agency these companies may have gone to, if they left plaintiff. He also does not know who, if anyone, has been receiving commissions.
The names of some of plaintiff s customers appear on plaintiffs Internet Web site.
In August 1998, before Everts left employment with plaintiff, plaintiff asked Everts and the other producers to sign a 13-page restrictive covenant/non-compete agreement. Everts received a number of voice messages from Philip Edmundson requesting that he sign the agreement. Everts did not sign the agreement. In or around September 1998, Everts asked Patricia Arsenault (an employee of plaintiff) for copies of any restrictive covenant governing Everts. Arsenault provided Everts with a copy of the 1993 agreement, noting that it was the only such document in the file and had not been signed by the company.
At the time Everts accepted employment with InterContinental, he did not believe he was subject to any restrictive covenant or noncompete agreement. When it hired Everts, InterContinental did not believe Everts was subject to an enforceable restrictive covenant or noncompete agreement with a prior employer.
At InterContinental, Everts continues to place insurance with California-based insurers, and he also currently has customers based in California.
There is no evidence before me that InterContinental has sought from Everts confidential information relating to customers of plaintiff.
After Everts left, plaintiff, through its attorneys, wrote a letter to Everts and a letter to InterContinental, alleging that Everts was in violation of the 1993 agreement.

DISCUSSION

Summary judgment is appropriate where there are no genuine issues of material fact and the summary judgment record entitles the moving party to judgment as a matter of law. Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating that there is no genuine issue of material fact on every relevant issue. Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). On matters for which the moving party does not bear the burden of proof at trial, it may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an *720 essential element of the nonmoving party’s case or by showing that the moving party has no reasonable expectation of proving an essential element of its case at trial. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). Once the moving party establishes the absence of a triable issue, the non-moving party must allege specific facts establishing the existence of a genuine issue of material fact and cannot defeat the motion by resting on mere assertions of disputed facts. LaLonde v. Eissner, 405 Mass. 207, 209 (1989). In deciding a motion for summary judgment, the court may consider pleadings, depositions, answers to interrogatories, admissions on file and affidavits. Community Nat'l Bank v. Dawes, 369 Mass. 550, 553 (1976); Mass.R.Civ.P. 56(c). The court may only consider undisputed material facts and apply them to the law. See Kelley v. Rossi, 395 Mass. 659, 663 (1985).

I. BREACH OF CONTRACT

Plaintiff alleges that Everts breached the 1996 agreement[23] by (1) soliciting insurance business from plaintiffs customers, (2) aiding another party in the solicitation of insurance business from plaintiffs customers and (3) using plaintiffs confidential information and trade secrets to plaintiffs detriment. I address this third allegation first.[24]

A. Analytical Framework

In Massachusetts,[25] a restrictive employment covenant is enforceable if the employer demonstrates that the agreement is (1) necessary to protect a legitimate business interest of the employer, (2) supported by consideration, (3) reasonable in scope and (4) otherwise consonant with the public interest. Whitinsville Plaza v. Kotseas, 378 Mass. 85, 102-03 (1979); Alexander & Alexander, Inc. v. Danahy, 21 Mass.App.Ct. 488, 496 (1986). Legitimate employer business interests include protection of trade secrets, confidential business information and good will. All Stainless, Inc. v. Colby, 364 Mass. 773, 779-80 (1974); Kroeger v. Stop & Shop Cos., 13 Mass.App.Ct. 310, 316 (1982).

B. Confidential Information and Trade Secrets

Upon termination, an employee “may carry away and use the general skill or knowledge acquired during the course of employment.” Dynamics Research Corp. v. Analytic Sciences Corp., 9 Mass.App.Ct. 254, 267 (1980) (citations and internal quotation marks omitted). He is not, however, permitted to use trade secrets or confidential business information. To determine whether information is a “trade secret” or “confidential business information” six factors are relevant: (1) the extent to which the information is known outside plaintiff s business, (2) the extent to which the information is known by employees and others involved in plaintiffs business, (3) the extent of measures taken by plaintiff to guard secrecy of the information, (4) the value of the information to plaintiff and its competitors, (5) the amount of effort or money expended by plaintiff in developingthe information, and (6) the ease or difficulty with which the information couldbe properly acquired or duplicated by others. Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840 (1972).[26]
The record before me is devoid of any direct evidence that Everts was in contact with confidential business information or trade secrets. Rather, the evidence indicates that Everts consulted insurance companies who did not limit their dealings to plaintiff but provided insurance quotes to others in the insurance brokerage business. The client information Everts possessed was available to any person who asked the client, assuming the client was willing to speak with such person. Besides including a very broad definition of the terms “trade secrets” and "confidential information” in the 1996 agreement, there is no evidence that plaintiff took measures to protect the secrecy of any information or designated specific information confidential. Even the November 9, 1998 memorandum which Everts took is not marked confidential. The record also indicates that Everts retained a memory of the customers he served. Nowhere in plaintiffs submissions is there evidence that establishes a disputed factual issue on this point.
Nonetheless, drawing all favorable inferences in favor of plaintiff as the non-moving party, and given the examples included in the 1996 agreement, I assume that while employed by plaintiff and its predecessors Everts was exposed to some information protected as trade secrets or as confidential business information, and I assume that the November 9, 1998 memorandum falls within this category.
However, even with this assumption in plaintiffs favor, the record does not show that Everts used any confidential information. Defendants have established that the information Everts used when he contacted the 13 companies that switched to InterContinental was his own recollection that he had serviced these accounts when working for plaintiff (and, in some cases, before working for plaintiff). The evidence does not show that this information — the fact that these companies were customers of plaintiff — is protectible information. There is no evidence, for example, that the product or service provided (insurance and risk management) is purchased only by a small percentage of potential clients, such that identity of those who buy is a valuable lead. The additional information Everts acquired — company-specific information as to insurance needs and premium quotes from insurers — was readily obtainable from the companies and from the insurers, respectively. As for the November 9, 1998 memorandum and customer list, there is no evidence Everts made any use of this. Plaintiff points to no evidence from which it can be inferred that Everts *721 utilized the list or memorandum in any way that caused damage to plaintiff.
For these reasons, I conclude that defendants are entitled to summary judgment on plaintiff s claim that Everts misused confidential information or trade secrets.
C. Solicitation
Plaintiff also argues that Everts violated the 1996 agreement by soliciting insurance business from plaintiffs customers or by aiding another party (presumably InterContinental) to do the same. At issue are the 13 companies that switched to InterContinental when Everts moved there. I note at the outset that there is no evidence in the summary judgment record from which a reasonable jury could conclude that InterContinental encouraged or even knew of Everts’ contact with the 13 companies at the time Everts contacted those companies.
The terms of the non-solicitation portion of the 1996 agreement are broad. Under its terms, Everts cannot directly or indirectly “call upon, canvass, solicit or approach” companies on whose accounts he worked, for the purpose of “soliciting and/or providing to such client the type of business placed by such client” by and/or through plaintiff. The questions before me now are (1) to what extent this language is enforceable in Massachusetts, under the analytical framework applicable to restrictive employment covenants, and (2) whether the summary judgment record establishes a disputed factual issue for trial.

1. Enforceability of the Language

As I note above, legitimate business interests of an employer include protection of trade secrets and confidential information and protection of good will. The determination of whether a restriction is necessary to protect the good will of an employer often, as here, subsumes an analysis of whether the former employee has knowledge of “some business secret or confidential information.” All Stainless, Inc., 364 Mass. at 779-80. The question here is to what extent the language of the non-solicitation portion of the agreement is necessary to protect plaintiffs good will.
An employer’s good will is traditionally defined as the employer’s positive reputation with its customers or potential customers, generated by repeat business with existing customers or by referrals to potential customers. Slate Co. v. Bikash, 343 Mass. 172, 175-76 (1961).
Two considerations are relevant to determining whether a restrictive covenant is necessary to protect an employer’s good will. First, the employer must demonstrate that his business involves good will. All Stainless, Inc., 364 Mass. at 779. Second, the employee must be in a position where he can appropriate that good will. Id. An employee is in such a position when he has knowledge of the employer’s trade secrets or confidential information or where the employee’s close association with the former employer’s customers might cause the customers to associate the employee, rather than the employer, with the service or products offered. Id. at 779-80.
I conclude that a bar against solicitation of customers could reasonably be found necessary to protect plaintiffs good will. The parties agree that plaintiffs business is of a type that involves good will (although they dispute who owns the good will). See Alexander & Alexander, Inc., 21 Mass.App.Ct. at 497. Also, as the employee with responsibility for accounts, a producer is in a position where he is capable of appropriating any good will that belongs to plaintiff by his knowledge of any secret or confidential business information of plaintiff or by his close association with the customers.
While it may have been necessary for plaintiff to bar Everts from soliciting customers on whose accounts he worked, I find and rule that the language of the agreement is too broad as a matter of law. The word “solicit” denotes an attempt to obtain something by persuasion, or to ask for the purpose of receiving. Black’s Law Dictionary 1248 (5th ed. 1979). Preventing Everts from attempting to persuade clients to move their accounts from plaintiff to a competitor could be found necessary to protect plaintiffs good will. However, the remaining terms, to “call upon, canvass ... or approach” sweep too widely. I construe the 1996 agreement strictly against plaintiff, because plaintiff is the drafter of the contract and because the contract is a post-employment restraint.[27] Sentry Ins. v. Firnstein, 14 Mass.App.Ct. 706, 707 (1982). Therefore, I focus on the word “solicit” and construe the non-solicitation clause to bar only this type of contact.[28]
2. The Summary Judgment Record
Applying the undisputed facts in the record to the 1996 agreement, I conclude that (1) the good will generated belonged to Everts, at least as to 12 companies and (2) Everts did not “solicit” any of the companies that switched to InterContinental.
As to 12 of the companies that switched to InterContinental, the undisputed facts show that the good will at issue was not that which plaintiff had previously acquired and Everts misappropriated. Rather, the good will was Everts’ “own making, which he had developed with customers as a result of his own enthusiasm, personality and abilities.” First E. Mortgage Corp. v. Gallagher, 2 Mass. L. Rptr. 350, No. 94-3727F (Suffolk Super.Ct. July 21, 1994) (Fremont-Smith, J.). See also Alexander & Alexander, Inc., 21 Mass.App.Ct. at 497 (“Good will is of great importance in the insurance brokerage business. Customers have repeated and multiple insurance needs. Prompt service, integrity, and loyalty are of some importance to customers who would tend to rely on key personnel who have demonstrated those qualities in the past”).
*722 Everts came to work for plaintiff after gaming experience and skills in the insurance business. He wrote the only newsletter used as a marketing tool. While Everts was accompanied by Philip Edmundson and an assistant on several occasions, there is no evidence that these two played any role in gaining new business. More significantly, the record does not show that these two joined Everts on any visits with any of the relevant 12 companies. There is no evidence that Everts took advantage of any system or training special to plaintiff to obtain business.
Most importantly, Everts himself solicited the business of those 12 companies. Two of these companies, Sasaki Associates and Envirogen, were customers that Everts brought to plaintiff when he first joined plaintiff. “The objective of a reasonable noncompetition clause is to protect the employer’s good will, not to appropriate the good will of the employee." Sentry Ins., 14 Mass.App.Ct. at 708. See 6A Corbin, Contracts §1391B (2000 Supp.).
To argue that there is evidence that plaintiff generated the good will at issue, plaintiff points to evidence that it provided clerical staff to Everts, sponsored Everts’ attendance at the Miller Heiman sales training program and provided Everts with the office supplies he needed to conduct business. However, plaintiff does not show how this translates into good will. While hiring an employee and providing him with an infrastructure necessary for him to do his job undoubtedly gives an employer significant rights to control the employee’s conduct, this does not mean that the good will which develops belongs to the employer.[29] There is no evidence from which a reasonable jury could find that this type of support served to enhance plaintiff s reputation with its customers in such a way as to generate good will. The undisputed fact that the 13 companies left plaintiff upon Everts’ mere statement that he left plaintiff, without persuasion by Everts (as I discuss below), does not show that plaintiff s support created any loyalty to plaintiff. To the contrary, it tends to indicate trust in Everts.
Plaintiff also points to a statement in an answer to an interrogatory that plaintiff provided Everts with “support and advice in relation to developing marketing plans for prospective clients.” Such evidence has the potential to show that some of the good will belongs to plaintiff. However, on the record before me, this scenario remains mere potential. Without any detail in the record to give meaning to the phrase, it adds virtually nothing to help plaintiff. A finding that plaintiff generated the good will using Everts as its intermediary, based on this record, would be speculative. At this stage, after discovery, this evidence is insufficient to create a disputed issue of fact on the issue of who owns the good will related to the 12 companies, particularly since plaintiff would possess such information.
The situation is different as to the remaining company, Environmental Project Control. This was one of plaintiffs house accounts assigned to Everts. Thus, it became a client of plaintiff without involvement by Everts. I assume, for purposes of this motion, that it was plaintiffs good will that resulted in Environmental Project Control becoming and remaining a client of plaintiff.[30] On the other hand, this company left plaintiff through the same means as the other 12, i.e., contact without persuasion by Everts. However, I conclude that the evidence does create a disputed issue of fact regarding the ownership of the good will created in connection with this company.
Even though I find that there is a disputed factual issue as to ownership of the good will as to this one company, I rule that the undisputed facts do not show that Everts violated the non-solicitation portion of the 1996 agreement as to any of the 13 companies that switched to InterContinental. Rather, the facts show that Everts contacted representatives of the companies, told them he was leaving plaintiff and told them where he was going. Construing the agreement as I believe I must, the critical undisputed fact is that Everts did not actively seek to persuade the companies to stay with him. Concern with an employee appropriating his former employer’s good will is realized when the employee appeals to a customer to leave the former employer by, e.g., providing reasons to do so. Here, there is no evidence Everts disparaged plaintiff or told the customers that InterContinental would be a better firm for them. Everts merely informed the customers of facts, and the customers indicated they wished to remain with Everts. There is not even a hint of hesitation by any of the companies, or any other evidence that the companies considered remaining with plaintiff
In its brief, plaintiff argues that the circumstances of this case excuse its inability to provide direct evidence that Everts violated the 1996 agreement. Plaintiff contends there is ample circumstantial evidence from which a reasonable jury could find Everts improperly solicited plaintiffs customers. I disagree. While summary judgment does not require direct evidence, it does require enough evidence to create a genuine disputed factual issue material to the case. On the record before me, there is insufficient evidence to create a disputed factual issue as to whether Everts improperly solicited plaintiffs customers.

II. The Remaining Counts

The above analysis disposes of the remaining counts. Plaintiffs brief focuses on its breach of contract claim and only once references the remaining counts.
In Count III, plaintiff alleges that Everts breached the implied covenant of good faith and fair dealing. See Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471 (1991). The undisputed facts do not support *723 a claim that Everts violated this implied covenant while employed by plaintiff.
Count IV alleges that InterContinental interfered with plaintiffs contractual relations. The summary judgment record contains no evidence to sustain this count.
Count VI alleges that Everts interfered with plaintiffs advantageous relationships with its customers by soliciting insurance business from those customers and diverting them to InterContinental. As noted, the undisputed facts show that Everts only contacted those customers and did not seek to persuade them to leave plaintiff. Moreover, the facts do not support a finding that Everts’ conduct was improper in motive or means. There is simply no evidence that Everts had an ulterior motive (e.g., to injure plaintiff) or used improper means such as deceit or coercion. See Draghetti v. Chmielewski, 416 Mass. 808, 816-17 (1994); United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 815 (1990).
Plaintiff argues that an improper motive may be inferred because Everts continued to work for plaintiff for more than a week after accepting an offer of employment from a competitor and before telling plaintiff he was leaving, because he kept the November 9, 1998 memorandum and attached client list, and because he contacted the 13 companies who switched to InterContinental. There is nothing improper in working for plaintiff after having accepted a job with a competitor. Augat, Inc. v. Aegis, Inc., 409 Mass. 165, 172 (1991) (at-will employee may plan to go into competition with employer and take active steps to do so while still employed; policy considerations are that “at-will employees should be allowed to change employers freely and competition should be encouraged”).
As noted, nothing appears to have resulted from Everts’ taking of the November 9, 1998 memorandum. There is simply no evidence before me that Everts ever used the list for any purpose. It is difficult to see how Everts could have had an intent to steal these customers without evidence he used the list. For this same reason, and for the additional reason that the memorandum itself suggests that plaintiff may want to lose these small accounts,[31] it is difficult to infer an intent to injure plaintiff by taking the list. Finally, the facts show nothing improper in Everts’ conduct toward the 13 companies who went to InterContinental.
Counts V and VII allege the tort of conversion and misappropriation of trade secrets and confidential information. As I discuss above, there is insufficient evidence in the summary judgment record that Everts improperly used any of plaintiffs trade secrets or confidential information. Even if I assumed that the November 9, 1998 memorandum and attachment contained protectible information, there is no evidence any harm resulted from this.
Count VIII alleges that both defendants violated G.L.c. 93A. There is no evidence that InterContinental or Everts engaged in any wrongful conduct. More importantly, c. 93A does not apply to claims arising out of an employment relationship. Manning v. Zuckerman, 388 Mass. 8, 12-15 (1983); Informix, Inc. v. Rennell, 41 Mass.App.Ct. 161, 163, review denied, 423 Mass. 1110 (1996).

ORDER

For the foregoing reasons, defendants’ motion for summary judgment is ALLOWED.

 Count I of the First Amended Complaint alleges breach of contract by Everts. Count II seeks specific performance. Count III alleges breach of the implied covenant of good faith and fair dealing. Count IV alleges that InterContinental intentionally interfered with plaintiffs contractual relations. Count V alleges that Everts converted plaintiffs confidential information and trade secrets for his own benefit. Count VI alleges that Everts intentionally interfered with plaintiffs advantageous relationships with its customers. Count VII alleges that Everts and InterContinental converted and misappropriated plaintiffs trade secrets. Count VIII alleges violation of G.L.c. 93A, §§2 and 11 by Everts and InterContinental.

 The original complaint was verified. The first amended complaint is not verified. Because plaintiff relies upon factual allegations contained in the verified complaint in opposition to defendants’ motion, I too rely upon the verified complaint for such facts. Citations to the complaint are to the original, verified complaint.

 There is a discrepancy in the record as to whether Everts was ever a producer at Hall & Co. In his affidavit, Everts states he was a producer in or about 1988. In his deposition testimony, he states he was an account manager at Hall & Co., and was not a producer there. Everts’ precise role at Hall & Co. does not affect my result.

 Everts’ supervisor at Hall & Co. was a producer.

 Plaintiff denies this fact, which is taken from Everts’ affidavit. However, plaintiff offers no evidence contradicting this assertion.

 Plaintiff disputes that Everts maintained a relationship with Sasaki Associates and Envirogen. Everts did not write business for either of those firms during this time, for jurisdictional reasons. As to Sasaki Associates, Everts maintained a friendly relationship with its principals, which included golf games. At one such game, Sasaki Associates’ chief operating officer stated “we need to do business with you again.”

 This 1993 agreement provides in substance: Everts’ employment is contingent on assent to the provisions of the agreement. Everts acknowledges that he will obtain knowledge of secret and confidential information belonging to Minet. Upon termination of employment, Everts will return to Minet all written data and information concerning its business including customer lists, data and information about customers, sources of business, markets for placement of business, sales materials, business forms and records and relationships and arrangements with insurers. Everts further agrees that he will not directly or indirectly use or divulge any secret or confidential information for two years after termination of employment.
Paragraph five states in full:
*724 For a period of two (2) years after termination of employment, Employee shall not either directly or indirectly, on Employee's own behalf or on behalf of any other business, do any business with, solicit any business from or contact any person, firm or corporation which was a customer or client of Minet during Employee’s tenure or which Minet was attempting to obtain as an account during the six (6) months immediately preceding termination of employment.

 The parties agree that Everts was not employed by Minet International Professional Indemnity Brokers, Inc. However, that corporation is the other party to the 1993 agreement. While Everts knew that Minet Insurance Services, Inc. had a number of corporate relatives, he did not attach any significance to the corporation named in the 1993 agreement. Everts testified that his letter offering employment came in the name of Minet Insurance Services, Inc. Everts also testified that when he got the 1993 agreement, he did not take note of the name because he had been told by persons at Minet Insurance Services, Inc. that the agreement was unenforceable.

 Minet Insurance Services, Inc. is a California-based corporation, and Everts signed the 1993 agreement in California. Plaintiff neither admits nor denies the statement by Newman (which, given the relationship between Minet Insurance Systems, Inc. and the plaintiff, I take as an admission). Plaintiff refers to nothing in the record contradicting this statement.

 The offer letter, dated February 6, 1996, states in relevant pan:
Dear Al,
We are pleased to offer you a position as Assistant Vice President in the Energy, Mining and Construction Unit located in Boston, Massachussetts [sic]. Your start date will be on or around April 1, 1996 .. . Your relocation from Los Angeles to Boston will be paid by Minet.
Attached please find revised Mutual Recital Agreements (Massachussetts [sic] version). Prior to starting the relocation process, please return the accepted offer of employment letter and executed Mutual Recital Agreements . . . Relocation will be contingent upon receipt of these completed forms.
Employment with the company is on an “at-will” basis and is not for a stated period of time. This letter represents our complete mutual understanding of the terms of the job offer. Once again, we are enthusiastic about offering you employment at Minet, Boston. Should you accept this offer of employment, please sign below and return it to the Human Resources Department in New York.

 For clarity, I set forth the corporate sales and name changes as they appear in the record:
1. William Gallagher Associates Insurance Agency, Inc. incorporated in Massachusetts in April 1983 and changed its name to Minet Insurance Brokers, Inc. by articles of amendment filed February 1, 1996. Minet Insurance Brokers, Inc. was owned by Minet, Inc., a New Jersey corporation. Minet, Inc. operated through various subsidiaries, including Minet International Professional Indemnity Brokers, Inc. Minet, Inc., in turn, was a subsidiary of the ultimate corporate parent, St. Paul Insurance Co.
2. On or about May 21, 1997, Minet, Inc. was sold to Aon Corp.
3. Philip J. Edmundson and William Gallagher purchased the stock of Minet Insurance Brokers, Inc. in 1997.
4. By articles of amendment filed October 1, 1997, Minet Insurance Brokers, Inc. changed its name to William Gallagher Associates Insurance Brokers, Inc., which is the name under which plaintiff filed this action.

 For clarity, I refer to the second party as plaintiff.

 The 1996 agreement states in relevant part:
MUTUAL RECITALS
[Plaintiff] is engaged in the business of insurance and reinsurance brokerage, risk management and risk consulting services (“The Business”), including the solicitation and servicing of the insurance, insurance-related and risk financing needs of corporations, professional service firms and partnerships, associations, and individual clients both nationally and worldwide . . . [Plaintiff] devotes substantial resources to identifying the needs of and to developing and maintaining relationships with existing and prospective clients. These clients constitute a substantial part of the goodwill of [plaintiffs] business. While these existing and prospective clients may be secured and/or serviced by [plaintiffs] employees, they remain at all times clients and prospective clients of [plaintiff]. In servicing [plaintiffs] existing and prospective clients, among other things, [plaintiff] makes available to its employees specially developed and researched insurance industry data and client-specific information, as well as an extensive network of support services.
During the course of employment with [plaintiff], employees receive and have access to proprietary and confidential information of [plaintiff], including but not limited to, information relating to [plaintiffs] clients, and their risk financing needs and characteristics, insurance markets for large or unusual commercial risks, [plaintiffs] own operations, market development, insurance and risk management requirements, and the conduct of [plaintiffs] affairs. Said data and information, not generally known in the relevant industry, constitute valuable assets to [plaintiff]. Through training and development, and access to proprietary and confidential information provided by [plaintiff], [plaintiffs] employees develop a unique set of skills and knowledge which enhances their effectiveness in The Business. Accordingly, the undersigned Employee is willing to enter into the covenants set forth herein in order to provide [plaintiff] with reasonable protection for its proprietary and confidential interest. Employee further acknowledges that it is reasonable to protect [plaintiff] against solicitation activities by the Employee for a limited period of time after Employee’s termination of employment with [plaintiff] to enable [plaintiff] to gain the benefit of its investment in the development of its business relationships with its clients . . . Section one states:
Trade Secrets and Confidential Information
(a) Employee shall not, either directly or indirectly, whether during or subsequent to employment, and except as may be required in the course of employment by [plaintiff], disclose, publish or communicate to any person or entity, or otherwise use for Employee’s own benefit, or for the benefit of any other person or entity other than [plaintiff], any trade secret, proprietary and/or confidential information and materials relating to The Business which Employee learns while employed by [plaintiff] or to which Employee gains access during the course of employment with [plaintiff]. Employee shall, during the course of employment with [plaintiff], use best efforts to prevent the unauthorized publication or misuse of any trade secret, proprietary and/or confidential information and materials of [plaintiff].
(b) All notes, memoranda, records, files, drawings, tapes, disks, documents (including machine-readable documents), equipment and other material relating in any way to any trade secret, proprietary and/or confidential information and materials of [plaintiff] or any of its clients shall be and remain the sole and exclusive property of [plaintiff].
(c) During and after employment. Employee will not remove or cause to be removed from [plaintiffs] premises *725 any trade secret, proprietary and/or confidential information and materials for purposes other than authorized work Employee performs and/or performed for [plaintiff]. Upon termination of employment, Employee agrees not to retain, but to return to [plaintiff], all trade secret, proprietary and/or confidential information and materials. Prior to termination of employment, Employee agrees to participate in an exit interview, at which time Employee may be asked to certify in writing under oath that Employee has complied with Employee’s obligation to [plaintiff] hereunder and has returned to [plaintiff] all trade secrets, proprietary and/or confidential information and materials belonging to [plaintiff]. At or prior to such exit interview (or at a later date if such information is not known at the time of such interview) Employee agrees to provide [plaintiff] advance written notice, indicating for whom Employee will work and in what capacity, after leaving [plaintiffs] employ. [Plaintiffs] failure to conduct an exit interview for any reason shall not constitute a waiver of any of the provisions of this Agreement.
(d) The terms trade secret, proprietary and/or confidential information and materials are to be construed as broadly as possible. Without prejudice to the generality of Section 1 of this Agreement, the following is a non-exhaustive list of matters which, in relation to [plaintiff], are acknowledged by Employee to constitute trade secrets, proprietary and/or confidential information and materials and must be treated as such by Employee: (i) any trade secrets of [plaintiff]; (ii) client and prospective client lists (including insurance programs, renewal dates, coverages and other information); (ill) all data, records, documents, specifications, computer programs, listings, disks, tapes, systems, documentation and manuals, processes, methods and intangible rights which are either developed by the Employee during the course of employment with [plaintiff] or to which the Employee has access during the course of employment; (iv) relationships and arrangements with insurers, reinsurers, retail and wholesale brokers, associations and other financial services institutions; (v) information which has been supplied in confidence by clients, correspondents or agents; (vi) professional advice taken by [plaintiff]; (vii) marketing strategies and plans, and products developed by plaintiff; and (viii) any other information made available to the Employee which is identified to the Employee as being of a confidential nature.
Section two provides in relevant part:
Non-Solicitation
(a) Employee agrees that, during Employee’s employment with [plaintiff] and for a period of twelve (12) calendar months following termination of employment with [plaintiff], Employee will not, directly or indirectly, call upon, canvass, solicit, or approach, or cause to be called upon, canvassed, solicited or approached, any client of [plaintiff] on whose accounts Employee worked, for the purposes of soliciting and/or providing to such client the type of business placed by such client through [plaintiff and/or the type of business placed by such client by plaintiff]. Clients on whose accounts Employee worked shall include only those clients for whom Employee placed business, facilitated the placement of business, or provided services in The Business, or clients whose business, [sic] was placed or serviced, or for whom services in The Business were provided, by employees who Employee supervised within the twenly-four (24) month period prior to termination of Employee’s employment with [plaintiff].
(b) Employee further agrees that during Employee’s employment with [plaintiff] and for a period of twelve (12) calendar months following termination of employment with [plaintiff], Employee will not call upon, canvass, solicit or approach or cause to be called upon, canvassed, solicited or approached, any person or entity which has been called upon or solicited (or to which [plaintiff] has submitted any proposal for the provision of services in The Business) within the six (6) calendar month period prior to the termination of Employee’s employment with [plaintiff], Any person or entity which has been called upon or solicited or to which [plaintiff] has submitted any proposal for the provision of services in The Business shall include only those persons or entities whose business Employee sought, negotiated for or attempted to provide services in The Business or whose business was sought, negotiated for or an attempt to provide services in The Business was made by employees whom Employee supervised within the six (6) month period prior to termination of Employee’s employment with [plaintiff].
Section three provides in full:
Non-Competition
Employee agrees that at all times during Employee’s employment relationship with [plaintiff], Employee shall not, directly or indirectly, render competing services in The Business for the Employee’s own behalf or on behalf of any other person or entity. Employee also agrees that while Employee is employed by [plaintiff], Employee will not undertake the planning or organization of any business activity competitive with the duties performed for [plaintiff] or engage in any other activity which interferes, directly or indirectly, with Employee's duties for and responsibilities to [plaintiff].
Section four states that the employee agrees for 12 months following termination to provide the prospective new employer with a copy of the 1996 agreement and allows plaintiff to do the same. Section five states that the employee agrees that plaintiff is entitled to injunctive relief against the employee for any breach or prospective breach of the agreement without posting a bond. The employee also agrees to pay expenses and reasonable attorneys fees plaintiff incurs to enforce the agreement. Section six contains a choice of law provision (choosing Massachusetts law). Section seven contains miscellaneous provisions: waiver of a term or condition does not indicate waiver of other rights; the agreement is enforceable by Minet’s successors; required notices are to be delivered according to specifications in the agreement; a severability clause is included and the agreement states it is the full understanding of the parties regarding non-disclosure, non-solicitation and non-competition by the employee. The final page of the agreement contains only the places for the parties’ signatures and, as noted above, only Everts’ signature appears.

 It is unclear precisely what costs were covered. The only relevant evidence the parties have referred to is that St. Paul paid Everts’ airfare when he flew to Boston to find an apartment. The amount St. Paul paid is not disclosed.

 In the portions of the Everts deposition to which the parties have referred there appears to be some difference in the function of account managers. When describing his responsibilities as an account manager at Hall & Co. in 1985, Everts testified that he performed many of the functions of a producer and that the principal difference between his job responsibilities and those of a producer were that the producer was a supervisor who was ultimately responsible for the accounts. Everts Dep. at 21-22. Later in the same deposition Everts testified that the account managers working for him (when he was a producer) performed clerical tasks such as issuing certificates of insurance. Everts Dep. at 170-74. As to this latter deposition testimony, Everts first terms his assistants “customer service reps” and then calls them account managers. Everts Dep. at 170-72. While it may be the case that account managers at Hall & Co. performed different functions than those working for plaintiff. It is not my role now to make factual determinations. I simply note that Everts’ *726 testimony is not necessarily contradictory and, more significantly, plaintiff has not pointed to any evidence to indicate that its account managers performed “producer-like" functions.

 Neither party refers to evidence regarding the location of the program, the cost of attendance and whether travel costs (if any) were paid by plaintiff.

 Everts does not indicate whether those other employers paid for his attendance.

 Plaintiff disputes that Everts left because he felt plaintiff was not adequately servicing clients. Plaintiff argues that this is vague and susceptible to multiple interpretations. Everts’ deposition testimony makes clear that he felt that there were too few customer service representatives (or account managers) and too rapid turnover of the same. According to Everts’ testimony, this was a problem because Everts was forced to perform the functions of the account managers and had to train other account managers, which reduced the time Everts was able to sell insurance and earn money.

 Plaintiff denies that Everts “brought” these two clients to Minet Insurance Services, Inc. However plaintiff offers no contrary evidence.

In his deposition. Everts testified:
There were some customers who I developed a long-term relationship with that I had a responsibility to let them know that I had left ... A lot of these small firms don’t have insurance staff. They relied on me for a lot of their risk management decisions ... These are people who I had a personal relationship with. These are people who I’ve known for a very long time. These are people who relied greatly on me for their business.
Everts Dep. at 77-78. When Everts told Joe Silvestri at Envirogen that he was leaving plaintiff, Silvestri responded by stating, “We’re coming with you,” and, “We don’t make a move without you.” Everts Dep. at 95-96.

 Everts called representatives of the companies, told the representatives that he was leaving plaintiff and told the representatives how to reach him at InterContinental. The companies’ representatives asked Everts how they could continue doing business through Everts.

 It is ironic that plaintiffs contract claims are now based on the 1996 agreement. Until discovery began in this case, the 1996 agreement appears to have disappeared from the memory of all concerned. When he left plaintiff, Everts was told that the 1993 agreement was the only restrictive covenant agreement governing his conduct. When plaintiffs counsel sent letters to Everts and InterContinental, the letters alleged violations of the 1993 agreement. The contract claims in the original complaint were based on the 1993 agreement. Only after reviewing documents in response to defendants’ discovery requests did plaintiff discover the existence of the 1996 agreement.

 Defendants argue that the 1996 agreement is not enforceable because it was never signed by plaintiff or its predecessors. Everts is the party charged with performance, and there is no dispute that the agreement bears his signature.

 The parties have spent considerable effort arguing choice of law. Because the 1996 agreement was signed in California, defendants assert that California law should apply. However, the agreement itself specifies that Massachusetts law applies; the agreement was signed in contemplation of a move to Massachusetts and the conduct constituting the basis of plaintiffs allegations occurred in Massachusetts. This is not a close case; I apply Massachusetts law. See Morris v. Watsco, Inc., 385 Mass. 672, 674-75 (1982); Steranko v. Inforex, Inc., 5 Mass.App.Ct. 253, 260 (1977).

 I decline to give full effect to the definition of trade secret and confidential information in the agreement. That definition, under which those terms are “to be construed as broadly as possible,” would include “all . . . documents ... to which the Employee has access during the course of employment.” Given the policy of the Commonwealth to enforce restrictive employment agreements only to the extent reasonable in scope, I look to the six traditional factors. Merely delineating examples of trade secrets and confidential information in an employment agreement does not, of course, substitute for record evidence that such actually existed. Dynamics Research Corp., 9 Mass.App. Ct. at 277-78. However, as I discuss above, I assume that Everts was exposed to some information protected by the agreement.

 In Alexander & Alexander, Inc., 21 Mass.App.Ct. at 498-99, the Appeals Court considered the enforceability of covenants not to compete that prohibit merely accepting or receiving business from particular companies. While the Appeals Court declined to nullify such language, that case differs from this case for several reasons. The Appeals Court there only affirmed the granting of a preliminary injunction. The Appeals Court also afforded the restrictive covenants the lesser scrutiny applicable to those arising out of the sale of a business, as distinguished from those arising out of an employer-employee relationship. Finally, the employee in that case entered into the covenants with the benefit of counsel. I do not consider that case as authority for the principle that an employee such as Everts can be barred from accepting or receiving business from customers of his former employer. Admittedly, Everts did more than merely accept or receive business. He contacted the companies himself. Nevertheless, on the record before me, I believe this case is distinguishable from Alexander & Alexander, Inc. In addition, my analysis is based in part on a construction of the term “solicit.” See infra n.28.

 This construction of the agreement’s terms is supported by the language of the agreement. Section 2 is titled “non-solicitation.” Subsection b places restrictions with respect to businesses plaintiff has “called upon or solicited (or to which [plaintiff] has submitted any proposal for the provision of services in The Business) . . .” These businesses are said to include only those whose business the employee sought, negotiated for or to which he attempted to provide services. The language in the parentheses and the subsequent limiting clause are evidence that the terms “called upon” and “solicited” envision an active, persuasive undertaking, such as submitting a proposal, negotiating or attempting to provide services. They do not connote mere contact.

 The same is true with respect to any training provided to or performance improvement achieved by Everts while employed by plaintiff. “An opportunity to develop good will which is no different from the opportunity any other like employee in the industry would have with some other firm is not traceable to the particular position and situation of the employer . . . Each party is entitled to keep the good will and reputation he would have had if he had never made a contract with this particular litigant, even though he may have had to make a contract with some other person in the same line of commerce to achieve that reputation and skill, or customer satisfaction.” 6A Corbin, Contracts §1391B(B) (2000 Sup.). See Dynamics Research Corp., 9 Mass.App.Ct. at 274-75; National Hearing Aid Ctrs., Inc. v. Avers, 2 MassApp.Ct. 285, 292-93 (1974).

 The Corbin treatise recognizes that a prior customer-firm relationship demonstrates that the employer created the good will. 6A Corbin, Contracts §1391B(B).

 See page 12 of this memorandum.