Fabricant, Judith, J.
INTRODUCTION
This action presents the plaintiff, Network Systems Architects Corporation’s, claim that its former employee, defendant Michael Dimitruk, has misappropriated its trade secrets, and used them for the benefit of his new employer, defendant Accunet Solutions, Inc. Before the Court are cross motions for summary judgment, as well as the plaintiffs motion for sanctions for spoliation and to compel discovery. For the reasons that will be explained, the defendants’ motion for summary judgment will be allowed in part and denied in part; the plaintiffs motion for summary judgment will be denied; and the plaintiffs motions for sanctions for spoliation of evidence and to compel discovery will be allowed.
BACKGROUND
The materials before the Court provide the following factual background. The plaintiff, Network System Architects Corporation (“NSA”), provides computer network communications and security hardware and software to businesses and government agencies. According to its complaint, verified by its president, Steven Ferrari, in the course of providing those services NSA collects sensitive information about its clients, including the vulnerabilities in the security of its clients’ networks, and the details of the security systems it creates for its clients. Its handling of such confidential client information, the verified complaint alleges, is essential to its relationships with customers and suppliers, which in turn form the basis of its competitive advantage.
In October of 2001, NSA hired Defendant Michael Dimitruk as Director of Sales. According to the verified complaint, his role included sales, contract negotiation, customer service, and “coordinating activities with [NSA]’s suppliers to obtain referrals to new customers.” In 2005 Dimitruk earned a total of $101,397 in salary and commissions; as of September 2006, according to the verified complaint, he “was on track to earn over $115,000.” In the course of performing his duties, Dimitruk, like other salespersons, formed personal relationships with clients. Dimitruk testified at his deposition that he also had pre-existing relationships with individuals at certain NSA clients, particularly Bain and General Dynamics, although he had never made any sale to Bain before joining NSA, and he had had no contact with the individual at General Dynamics while that person worked at that company prior to Dimitruk’s employment with NSA.
The extent of Dimitruk’s access to confidential information during his employment at NSA, and NSA’s efforts to protect such information, are subjects of much disagreement between the parties. The verified complaint asserts that NSA provided Dimitruk with access to its “current and prospective customer and supplier information databases, customer and supplier contacts, pricing strategies, and customer payment and creditworthiness histories.” More specifically, the verified complaint asserts that Dimitruk had access to “information relating to network and security of NSA’s customers, their annual support contract terms,” as well as pricing and customer contact information, and information about “creditworthiness, sales history and preferences.” In addition, according to the verified complaint, Dimitruk had access to information regarding vendors, including contact information, pricing, product details, and “prospective customer lists, contact names, quotations, and proposals.” Further, the verified complaint alleges, Dimitruk had access to information regarding NSA’s processes and methods for evaluation, specification, and design of its products; pricing strategy; finances; marketing, bidding and sales strategies; and overall business strategies.
The steps NSA took to protect the confidentiality of such information during Dimitruk’s employment, according to its verified complaint, included informing employees annually “that information concerning its suppliers and customers must be maintained confidential”; distributing information only on a “need-to-know” basis; requiring the use of passwords; and “storing data in alternate storage systems, and storing paper documents in locked areas.” In addition, according to the verified complaint, NSA requires suppliers to sign confidentiality agreements. At his deposition, Ferrari added that the company places copyright marks on its proposals to customers.
In March of2006, NSA distributed to its employees, including Dimitruk, a document entitled “Sales Compensation Plan.” The document sets out commission rates and terms, and then recites the company’s policy regarding confidential information, defined to include virtually all information about the company and its customers, and the employee’s duty to maintain confidentiality of all company information. There follows a provision restricting the employee from competition during employment and for one year thereafter. Dimitruk refused to sign the document, and denies that he ever read it.
When asked at his deposition to identify NSA’s confidential information, Ferrari responded “customer lists, contacts.” He explained that the information Dimitruk had access to was that kept on the NSA laptop computer issued to him, not other information kept on NSA’s server, and that Dimitruk did not have access to the company’s accounting information, or to “other people’s quotes or proposals, any of the financial information, any of the historical information about purchases and so on and so forth.”[1] Ferrari acknowledged also that some NSA employees are allowed to keep confidential information of NSA on personal laptop computers.
*341 On September 21, 2006, Dimitruk informed Ferrari that he intended to resign effective September 29, 2006.[2] Before Dimitruk’s departure, Ferrari told Dimitruk, both in person and by e-mail, that he was obligated to refrain from any use or dissemination of NSA’s confidential information. As far as the evidence discloses, at the time of Dimitruk’s departure from NSA he had no active uncompleted projects in progress at NSA, although he had submitted quotations to potential customers, including Xerox and Kodak, that were outstanding as of that date.
On September 29, 2006, Dimitruk’s last day at NSA, Ferrari sent him an e-mail asking that he “please return the laptop today.” Dimitruk did not do so at that time. On October 1, 2006, Dimitruk became employed with Accunet. On October 12, 2006, Ferrari followed up his request for the laptop with a letter directing that Dimitruk “[r]eturn the laptop immediately and any printed documents or materials or other property taken from NSA.” The letter went on to advise Dimitruk that “you have an obligation to protect the company assets and property. Things like company information, customers and contracts, its relationships, computers, data files and information, contracts, etc. or even the knowledge about the business is your responsibility to keep confidential.” Dimitruk responded, in an e-mail dated October 16, 2006, that “If Steve doesn’t want to sell the unit to me for $500, as he agreed to then I will return the unit to the office.” He did so sometime thereafter.[3] Before returning the laptop, however, as Dimitruk acknowledged in his deposition testimony, he used a “scrubbing” program to delete its contents.[4]
During his employment at Accunet, Dimitruk has made sales to four businesses that were his customers at NSA: Bain, Raytheon, General Dynamics, and EnvoyWorldWide.[5] Accunet had relationships with two of these customers, General Dynamics and Ray-theon, prior to its employment of Dimitruk; Bain and EnvoyWorldWide became new Accunet customers after Dimitruk’s transition. On September 15, 2006, while he was still employed with NSA, Dimitruk sent an e-mail to Bain proposing a meeting to discuss “changes for the positive.” Dimitruk also contacted EnvoyWorldWide while still employed with NSA, to inform his contact there, according to his deposition testimony, that he would be working for Accunet, and “to see if Accunet could be considered for other business opportunities.” NSA also offers evidence, in the form of e-mail communications, that while still employed with NSA Dimitruk contacted several other NSA customers and suppliers to discuss his future plans.
Dimitruk has testified that, after he began his employment with Accunet, he contacted customers and vendors with whom he had done business at NSA using only his memory of contact information and public sources. Dimitruk denies that he took or used any confidential information of NSA, or that he ever transferred any such information to Accunet. Alan Dumas, Accunet’s president, corroborates Dimitruk’s testimony, asserting in his affidavit that Dimitruk “has not transferred nor has Accunet used any proprietary or confidential information of NSA.” NSA contends that, on the contrary, Dimitruk copied confidential documents to his laptop computer and onto disks, transferred those materials to Accunet’s computer, and used such information to make client contacts on behalf of Accunet. In particular, NSA contends that Dimitruk took “customer information, supplier pricing, purchase orders, pricing, and NSA’s business plans.” In support of that contention, it offers opinions of its forensic computer expert, to be discussed further infra.
After Dimitruk left NSA, Ferrari assigned his accounts to himself and other salespeople. According to Ferrari’s deposition testimony, he contacted the customers discussed supra, but has not succeeded in obtaining business from them. Bain informed Ferrari that “they’re going to move all their business over to Accunet” because Dimitruk had gone to work there.
NSA brought this action on November 10, 2006. Its complaint asserts four claims against Dimitruk: misappropriation of trade secrets (count I); breach of fiduciary duty (count II); “breach of duty of loyalty” (count III);[6] intentional interference with contractual relations (count IV); and conversion (count V). The complaint also asserts two claims against Accunet: intentional interference with contractual relations (count IV), and violation of G.L.c. 93A (count VI).[7]
With the complaint NSA filed a motion for a temporary restraining order and preliminary injunction. After a hearing on November 15, 2006, the Court (Garsh, J.) issued a temporary restraining order barring Dimitruk from “taking, using or disposing of NSA’s trade secrets and confidential information,” which the order defined to exclude “the names and addresses of customers of NSA and contact names that he may recall,” as well as information supplied to Dimitruk after October 1, 2006, or obtained from third parties or public sources. The order also barred Accunet from “using or disclosing” any of NSA’s confidential information or permitting Dimitruk to use such information for its benefit. The order further required Dimitruk to return to NSA “any and all materials in any form or copies thereof that he deleted from NSA’s laptop or transferred to any computer.” After a further hearing on November 28, 2006, the Court continued the same order in effect, noting that “the plaintiff is not entitled to obtain a covenant not to compete in the absence of any agreement not to do so.”
The defendants answered the complaint on December 6, 2006, denying its substantive allegations, and including counterclaims on behalf of both Dimitruk and Accunet. Dimitruk’s counterclaims allege constructive termination and failure to pay certain commissions owed for sales made before his departure. *342 Accunet’s counterclaim alleges violation of G.L.c. 93A by misuse of information about Accunet obtained through NSA’s investigation of Dimitruk’s laptop computer. The summary judgment motions do not address the counterclaims.
As discovery proceeded, disputes generated further orders of the Court. After a hearing on April 12, 2007, the Court (Gants, J.) issued an order, dated April 13, 2007, requiring that NSA’s computer expert be given access to the laptop computer issued by Accunet to Dimitruk for examination, so as to determine whether any documents were copied onto that computer during September and October 2006, from any storage device. If so, the expert was to be permitted to examine such documents to determine whether they contained any confidential information of NSA, and if so, to copy them onto a storage device.
Soon thereafter, NSA moved to compel production of documents, including communications between Dimitruk and certain customers, and proposals to those customers, through the present. The Court (Gants, J.) denied the motion without prejudice, finding that the “extraordinaiy scope of the requests” would impose an unfair burden, but noted that it would permit further discovery “if the plaintiff develops stronger evidence as to the defendants’ misconduct.”
The record submitted includes a report of NSA’s computer forensics investigator, Eric Lundberg.[8] The report reflects his examination, beginning on February 15, 2007, of the laptop computer that NSA had issued to Dimitruk, and Dimitruk had returned to NSA. Based on his examination, Lundberg concluded that on October 22, 2006, over 1500 Word documents and Excel spreadsheets were deleted through the use of file shredder program. Names of documents deleted included references to NSA and to certain of its customers, and included the phrases “Bain Contract” and “pricelist.” Lundberg also found indication that a USB external device was attached on October 17, 2006, that “CD Rom Burning Sessions” took place during October 2006, and that the last files burned to a CD-Rom included two “Outlook PST files,” which Lundberg likens to “a very large suitcase.” Lundberg also found that a folder named “Accunet” had been deleted, and that the computer had been used for internet access on October 22 and 23, 2006.
Lundberg further reports that on April 4, 2007, he investigated an account on a website known as Plaxo, which he describes as “a service to keep people contacts, addresses, and personal information for networking.” Using the log-in name and password that Dimitruk had used while at NSA, Lundberg entered the account and determined that it was still in use as of that date.
Lundberg’s report goes on to describe his findings upon his investigation, on May 9, 2007, of the computer issued to Dimitruk by Accunet. Lundberg states that “[a] search of the Accunet computer found over 200 unique file names belonging to NSA,” including “customer information, supplier pricing, financial purchase orders, pricing and business plans,” as well as contact information from NSA and NSA e-mail. Lundberg also concluded that “the Accunet computer was connected to Accunet computer network enabling the transfer of information to Accunet commuters (sic) and servers.” Further, he found on the Accunet computer “a unique computer network address,” and found the same address on the NSA computer, leading to the conclusion that “the NSA computer was connected to Accunet corporate network.” From dates and file names on the Accunet computer, he concluded that Dimitruk “has used and recently used NSA information.” Lundberg concluded also that on October 17 and November 30, 2006, Dimitruk had used the Accunet computer “to access multiple secure web portals belonging to NSA suppliers ... using NSA login and password credentials,” and then changed those credentials to Accunet. Finally, Lundberg concluded that the computer showed evidence of the use of a file shredding program on November 17, 2006, April 12, 2007, and May 8, 2007.[9] These dates fall, respectively, two days after the hearing on the motion for temporary restraining order, the same day as the hearing on the plaintiffs’ motion for an order for examination of the Accunet computer, and the day before that examination occurred under court order.
In response to Lundberg’s report, the defendants offer an affidavit of their own expert, computer systems engineer Shaun Brown, who states that he was present during Lundberg’s examination of the Accunet computer. Brown offers alternative explanations for Lundberg’s findings, and disputes virtually all of Lundberg’s conclusions. He does not, however, dispute that a file shredding program was used on the computer on the dates indicated in Lundberg’s affidavit, nor does anything else offered provide any explanation for that action.
On the question of what harm the plaintiff has suffered as a result of the defendants’ alleged conduct, the evidence offered consists of interrogatoiy answers, and an unsworn report of accountant Michael Moriarty.[10] The interrogatoiy answers state that “NSA has lost revenue since October 2006 to Accunet Solutions, Inc. for support contracts, upgrades, and orders." As examples, it cites two Raytheon orders for Juniper products, and “the Checkpoint renewal for Bain & Company.” The answers go on to state that “(l)osses of revenue are continuing,” and that NSA has lost revenue from General Dynamics, Bain, Osram Sylvania, Xerox, Raytheon, andEnvoyWorldwide," and to present a comparison of revenue for 2006 and 2007 with anticipated revenue and with revenue from previous years.
Moriarty’s report concludes, in substance, that NSA “has suffered a significant loss of revenues” as “a *343 result of Michael Dimitruck’s (sic) resignation.” He identifies three “(l]ong-term, established customers who have ceased conducting business with NSA: Bain & Company, EnvoyWorldwide, and Xerox Corporation." Further, he reports that he has identified four instances with respect to these customers “where it appears that the sales process was initiated on behalf of NSA and apparently closed by another company.” The total sales price of those contracts was $122,244.79. Moriarty’s report does not purport to distinguish between revenues lost to NSA as a result of any misuse of trade secrets, and revenue lost merely as a result of competition, including competition by Dimitruk after his departure.
DISCUSSION
I. The Summary Judgment Motions
This Court grants summary judgment where the record establishes that no genuine issues of material fact exist, and that the moving party is entitled to judgment as a matter of law. See Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of establishing that there is no dispute of material fact on every relevant issue. See Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a genuine dispute of material fact either by submitting affirmative evidence negating an essential element of the non-moving party’s case, or by showing that the non-moving party has no reasonable expectation of proving an essential element of its case at trial. See Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
Once the moving party establishes the absence of a triable issue by either of these methods, the party opposing the motion must respond with evidence of specific facts establishing the existence of a genuine dispute. Pederson v. Time, 404 Mass. 14, 17 (1989). The opposing party may not rest on the allegations of the pleadings, or rely on “bare assertions and conclusions regarding [its own] understandings, beliefs, and assumptions.” Key Capital Corp. v. M&S Liquidating Corp., 27 Mass.App.Ct. 721, 728 (1989). Mere contradictions of factual allegations, without evidentiary support, are insufficient to raise questions of material fact sufficient to defeat a summary judgment motion. See Madsen v. Erwin, 395 Mass. 715, 721 (1985). The opposing party’s obligation, rather, is to demonstrate the existence of admissible evidence sufficient to meet the burden of proof on the issues raised by the motion.
In deciding motions for summary judgment, the Court may consider pleadings, depositions, answers to interrogatories, admissions on file and affidavits. For this purpose, a verified complaint is the equivalent of an affidavit, to the extent that its assertions are based on the personal knowledge of the verifying party. See Godbout v. Cousens, 396 Mass. 254, 262 (1985).[11] The Court considers the evidence in the light most favorable to the nonmoving party, but does not weigh evidence, assess credibility or find facts. See Dawes, 369 Mass. at 553; Mass.R.Civ.P. 56(c); Colley v. Benson, Young & Downs Insurance Agency, Inc., 42 Mass.App.Ct. 527, 528 (1997); see also Kelley v. Rossi, 395 Mass. 659, 663 (1985).
1. Count I: Misappropriation of Trade Secrets
Under the common law and statute, G.L.c. 93, §42, one who misappropriates trade secrets of another is liable for damages caused thereby. See Jet Spray Cooler, Inc. v. Crampton, 377 Mass. 159, 168-69 (1979) (“Jet Spray Cooler IP). To prove its claim against Dimitruk of misappropriation of trade secrets, NSA must show that it possessed non-public information of value to its business; that it took reasonable steps to preserve the secrecy of that information; that Dimitruk used or disclosed that information for his own benefit or that of Accunet; and that it has been harmed as a result. See Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 940 (1972) (“Jet Spray Cooler P); Peggy Lawton Kitchens, Inc. v. Hogan, 18 Mass.App.Ct. 937, 939 (1984). In the parties’ cross motions for summary judgment, each side contends that the record establishes the absence of any genuine dispute on each of these elements, and that it is entitled to judgment as a matter of law. In the Court’s view, the record reveals genuine factual disputes on each of these elements requiring resolution at trial.
As the defendants point out, the allegations of NSA’s verified complaint reflect an unrealistically broad assertion of trade secrets, encompassing virtually all information about NSA’s business, as well as its customers and vendors. To obtain summary judgment, however, it is not enough for defendants to show that NSA cannot obtain relief on everything it claims; they would have to show that NSA has no evidence of any trade secret. They have not done so. The evidence NSA offers, with reasonable inferences drawn in its favor, is enough to support a finding that it had, and that Dimitruk had access to, information about the history of particular customers’ accounts, including the needs of those customers and proposals made to them, and that NSA took reasonable steps to safeguard such information by allowing access to it only to employees who needed to have it, including Dimitruk, and by reminding those employees of its confidential nature. That is enough to survive summary judgment based on the elements of the existence of trade secrets and efforts to safeguard them.
As to misappropriation, Lundberg’s conclusions alone are enough to support a finding that Dimitruk transferred large numbers of files from the laptop issued to him by NSA to the laptop issued to him by Accunet, and from there to one or more other destinations. With that information, a factfinder could prop *344 erly consider, and draw an adverse inference from, the evidence that Dimitruk attempted to hide the contents of both laptop computers, and that he did so with respect to the Accunet computer during the course of this litigation, when he well knew of the claim of misappropriation of trade secrets, and on dates that correspond directly to orders of this Court requiring him to preserve such information and to make it available. See Gath v. M/A-Com, Inc, 440 Mass. 482, 491 (2003); Fletcher v. Dorchester Mut. Ins., 437 Mass. 544, 550 (2002), citing Kippenhan v. ChaulkServ., Inc., 428 Mass. 124, 126-28 (1998).
Harm is the weakest link in NSA’s evidence. The harm NSA must show is not merely a loss of revenue after Dimitruk’s departure, or even a loss of particular customers to Accunet. That NSA lost revenue, including from former customers, after the departure of its Director of Sales, is hardly surprising, and does not assist NSA’s claim.[12] Dimitruk is under no restriction on either competition with NSA or solicitation of its customers. He is free to contact and attempt to sell to the same customers he sold to while at NSA, as long as he does not use NSA’s trade secrets in doing so.
To obtain summary judgment, however, the defendants would have to show not just that NSA is unable to connect much or even most of its claimed harm to the misconduct alleged, but that it cannot prove any harm at all from that conduct, even with all reasonable inferences from the evidence drawn in its favor. That it cannot do. The evidence offered, including Lundberg’s findings, would support findings that Dimitruk sold to Bain on behalf of NSA; that shortly before his departure he communicated with Bain regarding his plans; that documents relating to Bain were on both laptop computers, and were among those deleted from the computers under the circumstances described supra, and that after Dimitruk’s departure Bain told Ferrari that it was transferring its business to Accunet. From these facts, a factfinder could reasonably infer that Dimitruk made use of the NSA documents in his possession for purposes related to sales to Bain on behalf of Accunet, and that his use of such documents played some causative role in Accunet’s success in accomplishing those sales. That is enough to prevent summary judgment.
NSA’s cross motion for summary judgment on this count warrants little discussion, since it relies almost entirely on evidence that is disputed, as set forth supra. Although Dimitruk has acknowledged attempting to clear the laptop computer, he has denied that he had any confidential NSA material on it when he left NSA, that he transferred any such material to his Accunet computer, or anywhere else, and that he used it in any way. His expert contradicts Lundberg’s conclusions. This evidence prevents summary judgment on behalf of NSA.
2. Counts II and III: Breach of Fiduciary Duty/Duty of Loyalty
Count II of the complaint alleges that Dimitruk breached “common law fiduciary duties” owed toward NSA by virtue of his employment. Count III alleges that Dimitruk breached “a duty of utmost loyalty” owed to NSA by virtue of his employment in “a position of trust and confidence. As noted supra, the complaint does not identify any distinction between these counts; nor does NSA’s memorandum in connection with the present motions. Accordingly, the Court will treat these two counts as one.
“Employees occupying positions of trust and confidence owe a duty of loyalty to their employer and must protect the interests of the employer.” Chelsea Indus., Inc. v. Gaffney, 389 Mass. 1, 11 (1983); see also Augat, Inc. v. Aegis, Inc., 409 Mass. 165, 166 (1991); Eastern Marble Products Corp. v. Roman Marble, Inc., 372 Mass. 835, 838-42 (1977); Lindsay v. Swift, 230 Mass. 407, 409 (1918). That duty ends when the employment ends; once the employment relationship has terminated, the former employee’s only duty to the former employer is to refrain from misappropriation of its trade secrets. See Augat, Inc. v. Aegis, Inc., 409 Mass. 165, 172 (1991). Even during employment, an employee is free to make plans for subsequent employment, including with a competitor. See id. (“An at-will employee may properly plan to go into competition with his employer and may take active steps to do so while still employed”). What the employee may not do during his employment is undermine his employer’s business, such as by diverting his employer’s customers or employees to a competitor, or its resources to uses that serve interests inconsistent with those of his employer. Id.
NSA’s allegations here focus heavily on Dimitruk’s conduct after the end of his employment. The Court has addressed that conduct supra, with respect to count I. If NSA can prevail in its effort to show misappropriation of trade secrets, and harm resulting, it will recover under count I; if it cannot, counts II and III provide no basis for recovery for post-employment conduct.
The misconduct NSA alleges during Dimitruk’s employment consists of his communications with Accunet’s president in connection with his transition, which NSA alleges included disclosure of secret information regarding NSA’s customer accounts, and his communications with certain customers and suppliers, particularly Bain and EnvoyWorldwide, in which he encouraged them to continue to do business with him after his departure. Evidence offered of the former is vague at best; e-mails make general reference to discussion of accounts, but nothing indicates disclosure of any identified secret information. As to the latter, however, it appears to be undisputed that Dimitruk had communications of the sort alleged with certain customers and suppliers while still employed *345 with NSA, and that one of those customers, Bain, thereafter transferred its business from NSA to Accunet. Those facts, together with the other evidence offered supra, are enough to warrant, but not to compel, the inference that Dimitruk’s conduct while still employed with NSA had a causal connection to NSA’s loss of business with Bain. It follows that summary judgment cannot be awarded to either side on this claim.
3.Count IV: Intentional Interference with Contractual Relations
“In an action for intentional interference with contractual relations, the plaintiff must prove that: (1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant’s interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant’s actions.” Wright v. Shriners Hosp. for Crippled Children, 412 Mass. 469, 476 (1992), quoting G.S. Enters., Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991). Here, NSA has offered no evidence to show that any contract it had with any third party was breached at all, let alone at Dimitruk’s or Accunet’s urging. Defendants are therefore entitled to summary judgment on this count. .
In response to the defendants’ motion, NSA argues that the defendants have interfered with its advantageous business relationships with its customers and suppliers, by soliciting them for business with Accunet, and by using NSA’s trade secrets to do so. The complaint does not allege interference with advantageous business relations, which is a separate tort with separate elements. Amendment could cure the gap, if the evidence would support such a claim. To prove interference with advantageous business relations, the plaintiff would have to prove “(1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant’s interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant’s actions.” Blackstone v. Cashman, 448 Mass. 255, 260 (2007), citing Weber v. Community Teamwork, Inc., 434 Mass. 761, 781 (2001).
Here, the only improper means or motive that appears in the evidence offered is the misappropriation of trade secrets that is alleged in count I. Ordinary competition, for personal financial gain, without misappropriation of trade secrets, is not improper. See King v. Driscoll, 418 Mass. 576, 587 (1994), citing United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 817 (1990) (“The motivation of personal gain, including financial gain, however, generally is not enough to satisfy the improper interference requirement”). If NSA succeeds in proving misappropriation of its trade secrets, it will prevail on count I, and an additional count of interference with advantageous business relations will add nothing. If it cannot, it will be unable to show interference with advantageous business relations by improper means. Amendment to add such a claim would serve no purpose.
4.Count V: Conversion
Count v. alleges that NSA “has an immediate right to recover from Dimitruk all copies, in any form, of the information which he deleted from the company’s laptop computer,” and that Dimitruk has converted “NSA’s information.” Dimitruk argues that information is not personal property subject to conversion. NSA responds by clarifying that the subject of its conversion claim is not information, but computer files containing such information. In the modem world, computer files hold the same place as physical documents have in the past. If paper documents can be converted, as they no doubt can, see King v. Trustees of Boston Univ., 420 Mass. 52, 53 (1995), Sherman v. Collingwood, 221 Mass. 8, 11 (1915), no reason appears that computer files cannot. See Thryoff v. Nationwide Mut. Ins. Co., 8 N.Y.3d 283, 290-93 (2007); see also Kremen v. Cohen, 337 F.3d 1024, 1033-34 (9th Cir. 2003) (internet domain name); Shmueli v. Corcoran Group, 802 N.Y.S.2d 871, 873-79 (2005) (computerized client/investor list); Town & Country Props, Inc. v. Riggins, 249 Va. 387, 396-97 (1995) (person’s name). For the reasons already discussed, the evidence presented here is sufficient to support, but not to compel, a finding that Dimitruk converted computer files belonging to NSA. Accordingly, summary judgment cannot be granted for either side on this count.
5.Count VI: General Laws Chapter 93A
NSA’s final claim is brought against Accunet for unfair competition under G.L.c. 93A, §11, based on the allegation of misappropriation of trade secrets. Accunet contends that it is entitled to judgment on this claim because the claim arises from the employment relationship between NSA and Dimitruk. See Manning v. Zuckerman, 388 Mass. 8, 15 (1983) (“Disputes arising out of the employment relationship between an employer and employee are not cognizable under c. 93A’j; Informix v. Rennell, 41 Mass.App.Ct. 161, 163 (1996) (claim of post-employment violation of non-competition clause of employment agreement arises out of employment relationship).
NSA’s claim against Accunet under c. 93A alleges that Accunet has misappropriated NSA’s trade secrets. That claim does not arise from any employment relationship, except in the sense that Accunet had the opportunity to do so as a result of Dimitruk’s access to NSA’s trade secrets in the course of his employment. In this respect, NSA’s claim against Accunet falls squarely within the purview of Peggy Lawton Kitchens, 18 Mass.App.Ct. at 940, in which the Court affirmed a judgment under G.L.c. 93A against a former *346 employee’s new company for misappropriation of the former employer’s trade secret. Accunet, like the new company in Peggy Lawton Kitchens, was never an employee of NSA, and so far as NSA’s claim concerns Dimitruk, it relates only to his misappropriation of NSA’s trade secrets as an employee of Accunet. See Informix v. Rennell 41 Mass.App.Ct. at 163, n.2. Summary judgment is not appropriate on this count. Accordingly, summary judgment will be entered for the defendants on count IV, alleging intentional interference with contractual relations. In all other respects, the cross motions for summary judgment will be denied.
II. Spoliation of Evidence
As discussed supra, although the parties offer conflicting expert opinions regarding the conclusions to be drawn from information obtained from the two laptop computers, it is undisputed that both computers were subjected to efforts at deletion of their contents. Dimitruk acknowledges that he used a file shredder program on his NSA laptop before returning it, and the defendants have not contested Lundberg’s determination that the Accunet laptop showed evidence of the use of such a program on three dates, each of which relates directly to significant events in this case. That conduct was in clear violation of orders issued in this case. NSA characterizes this conduct as spoliation of evidence, and seeks sanctions.
The doctrine of spoliation is “based on the premise that a party who has negligently or intentionally lost or destroyed evidence known to be relevant for an upcoming legal proceeding should be held accountable for any unfair prejudice that results.” Westover v. Leiserv, Inc., 64 Mass.App.Ct. 109, 113 (2005). “Once spoliation has been established, the judge has the discretion to craft a remedy addressing ‘the precise unfairness that would otherwise result.’ ” Id., quoting Fletcher v. Dorchester Mut Ins. Co., 437 Mass. 544, 549-50 (2002). The remedy chosen may include “instructing the jury on the adverse inferences that may be drawn from spoliation.” Gath v. M/A-Com, Inc., 440 Mass. 482, 488 (2003). “As a general rule, a judge should impose the least severe sanction necessary to remedy the prejudice to the nonspolitating party.” Westover, 64 Mass.App.Ct. at 113, quoting Keene v. Brigham & Women’s Hosp., Inc., 449 Mass. 223, 235 (2003) (internal quotation marks omitted).
The Court agrees with NSA that the defendants’ conduct, at least with respect to the Accunet computer, constitutes spoliation of evidence. By the time of the first use of the file shredder program on that computer, Dimitruk and Accunet knew of this action, including its claim of misappropriation of trade secrets, and knew that this Court had ordered them to refrain from using or disposing of any of NSA’s documents, and had ordered Dimitruk to return to NSA “any and all materials in any form or copies thereof that he deleted from NSA’s laptop or transferred to any computer.” By the time of the use of the shredder program on the Accunet computer on April 12, the defendants knew that NSA was seeking a court order of access to that veiy computer.[13] The conclusion is inescapable that the defendants deliberately sought to prevent discovery by NSA, for purposes of evidence in this case, of whatever was on that computer. It dees not necessarily follow that what was on the computer was incriminating, but the inference is certainly strong.
The difficult question is what remedy is appropriate. NSA offers two suggestions: the Court should enter judgment against the defendants; and the Court should allow NSA the discovery that was previously denied, including production of documents relating to Accunet’s sales, and should further order that NSA be given access to the subset copy of the hard drive of the Accunet computer for further analysis.
Although the defendant’s conduct is egregious, the Court is not persuaded that it warrants entry of judgment on NSA’s claims. As discussed supra, the evidence NSA offers to support those claims, although sufficient to withstand summary judgment, is not strong. The defendants have conducted themselves in connection with this litigation as if they were guilty, but the factual record suggests that they maybe guilty of nothing more than legitimate competition. Entry of judgment by default, under these circumstances may work an injustice. Moreover, entry of judgment on liability by default, as a sanction for spoliation, would leave open the problem of how to determine the damages caused by the alleged conduct. That, as discussed supra, appears to be the most difficult part of the plaintiffs claim.
The Court is persuaded, however, that having been deprived of evidence it should have had, the plaintiff is entitled to make up for that deprivation as best it can by obtaining the discovery it was previously denied, and by obtaining access to the computer hard drive for whatever additional analysis it can perform at this time. Accordingly, the Court will allow the plaintiffs motion to compel.
In addition, in the Court’s view the defendant’s conduct warrants two additional sanctions. First, the Court will dismiss the counterclaims, because a party who defies court orders, as these defendants have, is not in a position to seek remedies from the Court. Second, the Court will require the defendants to pay whatever attorneys fees or other costs the plaintiffs can show were incurred as a direct result of the defendants’ conduct in using the file shredder program on the Accunet computer. Such costs would include attorneys fees expended in connection with the motion for sanctions for spoliation, and may also include a portion of the fees for Lundberg’s services. The plaintiff may submit an application for such fees and costs, with appropriate documentation, pursuant to Superior Rule 9A, within thirty days of this date.
*347 CONCLUSION AND ORDER
For the reasons stated, defendants Michael Dimitruk and Accunet Solutions, Inc.’s Motion for Summary Judgment is ALLOWED with respect to Count IV of the complaint, alleging intentional interference with contractual relations, and in all other respects is DENIED. The plaintiff Network Systems Architects Corporation’s Motion for Summary Judgment is DENIED. The plaintiffs Motion for Sanctions for Spoliation of Evidence is ALLOWED. As sanction for spoliation, the counterclaims of both defendants are ordered DISMISSED, and the plaintiff may submit an application for attorneys fees and costs, as described herein, pursuant to Superior Court Rule 9A, within thirty days. The Plaintiffs Motion to Compel is ALLOWED.

The defendants also cite certain answers to interrogatories as narrowing NSA’s claims as to the confidential information to which Dimitruk had access. The Court has reviewed the cited material and finds nothing to support the defendants’ contention on this point.

The defendants’ statement of undisputed facts pursuant to Superior Court Rule 9A(b)(5) asserts that Ferrari knew that Dimitruk was leaving by September 13, 2006, and cites as support pp. 53-54 of the deposition of Jeffrey Brown. The Court has reviewed the cited pages, and findings nothing to support this assertion. The verified complaint dates Dimitruk’s notice to Ferrari as September 21, 2006.

The precise date of return of the laptop is not clearly established in the materials submitted, but the parties do not appear to contend that it is disputed.

Dimitruk’s deposition testimony gives varied explanations for this conduct; at one point he says that he expected to keep the laptop, under an agreement to buy it from NSA, and that he was attempting to remove NSA materials; at another point he indicates that he was attempting to remove personal materials before returning the laptop to NSA.

NSA does not concede that these four are the only such sales Dimitruk has made to its customers on behalf of Accunet, but these four are the only ones as to which evidence of such sales is offered.

The distinction, if any, between this claim and count II is not apparent in the pleading.

Count VII does not assert a distinct claim, but merely seeks injunctive relief against both defendants based on the claims asserted in the other counts.

Although the report is unsworn, the substance of Lundberg’s findings and opinions is presented in NSA’s sworn answers to interrogatories.

Lundberg’s report includes assertions, in rather hyperbolic terms, regarding Dimitruk’s state of mind, as well as statements regarding ownership of, and the confidential and proprietary nature of, certain information. The Court disregards these as beyond Lundberg’s expertise.

The substance of this report, unlike Lundberg’s, does not appear to have been provided in any interrogatory answer or other testimonial form.

The verified complaint in this case includes statements that appear to be within Ferrari’s personal knowledge, and some that do not. The Court has considered the former and disregarded the latter.

For this reason, Moriarty’s report would do little to support NSA’s claim, even if it had been submitted in affidavit form, so that it could properly be considered on summary judgment.

NSA points out also that its counsel had notified the defendants’ counsel, by e-mail dated March 7, 2007, that it would be filing a motion seeking such access, and that “You are obligated to inform your client to preserve any e-mails or documents that relate to this case.”